Docket No. 101697.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

_____

J.S.A. *et al*., Appellants, v. M.H. *et al*., Appellees.

*Opinion filed February 1, 2007.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

Justice Fitzgerald took no part in the decision.

**OPINION**

Plaintiff, J.S.A., filed an action in the circuit court of Will County to establish a parent and child relationship with W.T.H. pursuant to the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/1 *et seq.* (West 1998)). Thereafter, the mother of W.T.H., M.H., and her husband, W.C.H., filed a petition to adopt W.T.H. pursuant to the Adoption Act (750 ILCS 50/1 *et seq.* (West 1998)). Both actions proceeded in the circuit court, with M.H. and W.C.H. ultimately filing an interlocutory appeal of certain orders entered by the trial court. The appellate court dismissed the appeal on the basis that it lacked jurisdiction to hear the action. 361 Ill. App. 3d 745. The appellate court held that because J.S.A. failed to register with the Putative Father Registry (750 ILCS 50/12.1 (West 1998)), he was therefore

barred from maintaining his parentage action. As a result, the appellate court declared all orders entered in the parentage action void *ab initio*. For the reasons that follow, we vacate the judgment of the appellate court and remand this cause to that court for further proceedings consistent with this opinion.

BACKGROUND

As an initial matter, we note that this case has had a tortuous seven-year litigation history. Because the instant appeal is limited to reviewing the appellate court's ruling that it lacked jurisdiction to hear an interlocutory appeal of certain orders entered by the circuit court, we recount only those facts here which are pertinent to the issues raised in the matter before us.

J.S.A. and M.H. are attorneys who shared office space together. From 1993 to 1998, J.S.A. and M.H. engaged in an extramarital sexual affair while each was married to other individuals. A male child, W.T.H., was born to M.H. during this affair on January 26, 1996. M.H.'s husband, W.C.H., was listed as W.T.H.'s father on the child's birth certificate. However, in February 1999, after the affair between J.S.A. and M.H. ended, the parties–at the urging of J.S.A.–agreed to perform a deoxyribonucleic acid (DNA) "self-test" to determine W.T.H.'s paternity. The results of this test allegedly established that J.S.A. was the child's biological father. Thereafter, in July 1999, M.H. told her husband, W.C.H., about her affair with J.S.A. and the possibility that J.S.A. was W.T.H.'s father. W.C.H. continued to raise W.T.H. as his own son, and M.H. and W.C.H. remain married.

On September 9, 1999, J.S.A. filed a petition in the circuit court of Will County to determine the existence of a father-child relationship with W.T.H. This petition was filed pursuant to the Parentage Act (750 ILCS 45/1 *et seq.* (West 1998)) and named M.H. as the respondent. In his petition, J.S.A. alleged that he was the biological father of W.T.H.

Approximately six weeks later, on October 20, 1999, M.H. and her husband, W.C.H., filed in the circuit court of Will County a "Petition to Adopt Related Child" pursuant to the Adoption Act (750 ILCS 50/1 *et seq.* (West 1998)) and named J.S.A. and the minor child, W.T.H., as respondents. The adoption petition alleged that M.H.'s

husband, W.C.H., is not only the biological father of W.T.H., but that W.C.H. is also the presumed father of W.T.H. because W.C.H. and M.H. were married at the time of the child's birth. In addition, the adoption petition alleged that J.S.A. was an "unfit person within the meaning of the Illinois Adoption Act" because, *inter alia*, he "evidence[d] his intent to forgo his parental rights, as manifested by his failure *** [t]o commence legal proceedings to establish his paternity under the Illinois Parentage Act of 1984."

In addition to filing the adoption petition, the marital couple also filed on that same date a petition to terminate the parental rights of J.S.A. The petition alleged that J.S.A. is an "unfit parent and his parental rights should be terminated" because, *inter alia*, he did not commence legal proceedings to establish his paternity of W.T.H.

On November 1, 1999, J.S.A. filed in the circuit court a pleading styled "Motion to Stay Adoption Proceedings Pending Determination of Paternity." In his motion, J.S.A. referenced the February 1999 DNA test and attached a lab report which allegedly disclosed that J.S.A. had a 99.93% probability of being the biological father of W.T.H. J.S.A. asked in his motion that a "determination of the paternity of the child *** take place prior to any proceedings in the adoption case in light of the fact that the paternity of the child is the threshold question in the adoption." Accordingly, J.S.A. requested that the adoption proceedings be stayed pending the court's ruling on whether the parties would be ordered to take DNA tests to determine the paternity of the child.

Also on November 1, 1999, M.H. and W.C.H. filed a motion to strike J.S.A.'s motion to stay the adoption proceedings. This motion attacked J.S.A.'s statements with respect to the prior DNA testing in February 1999, contending that the allegations made in J.S.A.'s motion and the attached lab report were "a blatant attempt *** to introduce inadmissible evidence, and thereby prejudice the court, *** [as J.S.A.] is well aware that there exists no documentation of the chain of custody of the blood or tissue samples, nor the requisite affidavit or certification necessary to establish the chain of custody concerning the alleged blood tests."

On November 15, 1999, J.S.A. filed with the circuit court a motion to strike and dismiss the petition to terminate his parental rights. This motion, brought pursuant to section 2–615 of the Code of

Civil Procedure (735 ILCS 5/2–615 (West 1998)), alleged that the petition to terminate his parental rights filed by the marital couple was inconsistent with their previously filed "Petition to Adopt Related Child" and, therefore, should be dismissed. Specifically, J.S.A. noted in his motion that the petition to terminate his parental rights was "premature and inconsistent," as it stated that he was an "unfit parent and his parental rights should be terminated" despite the fact that there had not yet been any judicial determination that J.S.A. was, in fact, the biological father of the child. J.S.A. requested that the court either dismiss the petition to terminate his parental rights or at least stay proceedings on that petition pending a determination by the court with respect to whether J.S.A. is the natural father of W.T.H.

Also on November 15, 1999, J.S.A. additionally filed a motion to strike and dismiss the adoption action filed by the marital couple. This motion, which was brought pursuant to sections 2–603 and 2–615 of the Code of Civil Procedure (735 ILCS 5/2–603, 2–615 (West 1998)), alleged that the adoption petition was flawed not only in that it pled two separate causes of action in one count, but also that the statements pled were "completely and entirely inconsistent" to the extent that the document stated that it was a "petition to adopt a related child," but also stated that W.C.H. is the child's biological father. J.S.A. argued that if W.C.H. were indeed W.T.H.'s biological father, then there would be no need for W.C.H. to file a petition to adopt his own child.

In turn, on February 9, 2000, M.H. and W.C.H. filed a motion in the circuit court pursuant to section 2–619 of the Code of Civil Procedure (735 ILCS 5/2–619 (West 1998)) not only to dismiss J.S.A.'s parentage action, but also to dismiss J.S.A. as a party to the adoption proceedings. The marital couple argued that J.S.A.'s failure to comply with the Putative Father Registry provisions contained in section 12.1 of the Adoption Act (750 ILCS 50/12.1 (West 1998)) barred him from maintaining any action to assert any interest in W.T.H., either through the adoption or the parentage action. The marital couple concluded their dismissal motion by contending that because J.S.A. was statutorily barred from bringing any action to assert any interest in the child, he therefore lacked standing to file any motion concerning the paternity of W.T.H. or the validity of the adoption petition.

On June 7, 2000, the circuit court entered an order in which it ruled on the various motions filed by the parties. All motions filed by J.S.A. were denied. The circuit court, however, granted M.H. and W.C.H.'s motion to dismiss J.S.A. as a party to the adoption proceeding based on his failure to register with the Putative Father Registry. Finally, the circuit court denied M.H. and W.C.H.'s motion to dismiss J.S.A.'s parentage action, thereby allowing that action to proceed forward.

Thereafter, on June 20, 2000, the circuit court entered an order staying the adoption proceedings pending the outcome of the parentage action. In addition, the court stated in this order that it was taking J.S.A.'s motion to reconsider and vacate its June 7, 2000, order under advisement. According to the record before us, however, it appears that the circuit court never made a subsequent ruling on J.S.A.'s motion to reconsider and vacate the June 7 order.

As J.S.A.'s parentage action proceeded forward, the marital couple filed a motion to hold a hearing to determine whether it was in the best interests of the child, W.T.H., to proceed with the parentage litigation and to order DNA testing. The circuit court granted this motion and held a best-interests hearing. It appears from the record that the best-interests proceedings were conducted on a periodic basis over the span of a year, with both parties testifying and calling witnesses, including several experts. On November 21, 2001, the circuit court issued oral findings of fact and conclusions of law with respect to its best-interests determination. The court found that the best interests of the child were served by denying J.S.A.'s request for DNA testing and dismissing his parentage action in its entirety. On December 7, 2001, the court entered a written order which adopted its November 21 oral findings and conclusions and dismissed J.S.A.'s parentage petition with prejudice. On January 4, 2002, the circuit court entered an order *nunc pro tunc* to amend the December 7, 2001, order to include language pursuant to Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)) to allow an interlocutory appeal.

J.S.A. appealed the circuit court's decision, arguing that the circuit court exceeded its authority under the Parentage Act by ordering a best-interests hearing prior to conducting DNA testing. On review, the appellate court agreed with J.S.A. and held that the circuit court erred in holding a best-interests hearing as a prerequisite to ordering DNA

-5-

testing in an action filed pursuant to the Parentage Act. *J.S.A. v. M.H.*, 343 Ill. App. 3d 217 (2003) (hereinafter, *J.S.A. I*). In its decision, the appellate court noted that section 11(a) of the Parentage Act mandates that "[a]s soon as practicable, the court *** may, and upon the request of a party shall, order or direct the mother, child and alleged father to submit to [DNA] tests to determine inherited characteristics." 750 ILCS 45/11(a) (West 1998). The appellate court held that because the statute contains the mandatory word "shall," the circuit court was required to order DNA testing upon the request of J.S.A., and it possessed no inherent authority to deviate from the statutory requirement and order a best-interests hearing prior to allowing DNA testing to proceed. *J.S.A. I*, 343 Ill. App. 3d at 222. Accordingly, the appellate court determined that the circuit court erred in dismissing J.S.A.'s parentage petition, and remanded the cause to the circuit court for further proceedings consistent with its opinion.

The mandate from the parties' first appeal in *J.S.A. I* issued in February 2004. It appears from the record that the adoption case was reassigned to the original trial court judge so that he could rule on J.S.A.'s still-pending motion to reconsider and vacate the June 7, 2000, order which dismissed J.S.A. from the adoption action. As stated, it appears from the record that no such ruling was issued by that judge.

With respect to the parentage action, it appears that upon remand that cause was assigned to the presiding judge. On March 18, 2004, the circuit court ordered that J.S.A., M.H. and W.T.H. submit to DNA testing. The next month, M.H. and W.C.H. filed a verified petition to enjoin performance of DNA testing until the resolution of the adoption action. Thereafter, on May 4, 2004, the parentage and adoption cases were reassigned to one judge, and on May 11, 2004, that judge consolidated both cases for all purposes other than trial. Thereafter, M.H. and W.C.H. filed, *inter alia*, a motion requesting the circuit court to sever the parentage and adoption cases. On June 7, 2004, the circuit court denied the marital couple's petition for injunctive relief. Subsequently, J.S.A. filed a motion requesting that M.H.'s husband W.C.H. also be required to submit to DNA testing pursuant to Supreme Court Rule 215 (166 Ill. 2d R. 215). In response, the marital couple filed a motion to dismiss J.S.A.'s request

-6-

for Rule 215 discovery. This motion was denied by the circuit court on June 25, 2004. Subsequently, on August 24, 2004, the circuit court denied the marital couple's motion to sever the adoption and parentage cases, ordered that the previously entered stay in the adoption case remain in effect pending the results of the DNA test, and ordered the parties to submit to DNA testing on September 9, 2004.

M.H. and W.C.H. filed a notice of interlocutory appeal with the appellate court on September 2, 2004. This appeal involved review of the following rulings rendered by the circuit court: the circuit court's denial of M.H. and W.C.H.'s motion to enjoin DNA testing; the circuit court's denial of their motion to dismiss J.S.A.'s motion for Rule 215 discovery; and the circuit court's denial of their motion to sever the parentage and adoption actions and to lift the stay in the adoption case. During the pendency of this appeal, however, the circuit court proceeded forward on J.S.A.'s parentage action. In an order dated April 28, 2005, the circuit court entered a finding in the parentage action that J.S.A. is the biological father of W.T.H.

On October 28, 2005, the appellate court filed a published decision in which it dismissed M.H. and W.C.H.'s appeal for lack of jurisdiction. 361 Ill. App. 3d 745 (hereinafter, *J.S.A. II*). The appellate court determined that it lacked jurisdiction to consider the appeal based on the failure of J.S.A. to register with the Putative Father Registry prior to filing his parentage action. First, the appellate court noted that, pursuant to the Putative Father Registry provisions contained within section 12.1 of the Adoption Act, a putative father is required to register no later than 30 days after the birth of the child. 750 ILCS 50/12.1(b) (West 1998). The appellate court further observed that under the Putative Father Registry provisions, a putative father who fails to timely register in accordance with the statute is generally barred from thereafter bringing or maintaining any action to assert any interest in the child. 750 ILCS 50/12.1(g) (West 1998). The appellate court then found that, in the matter at bar, it was undisputed that J.S.A. never registered with the Putative Father Registry and that J.S.A. did not offer any evidence excepting him from making a timely registration. According to the appellate panel, because J.S.A. did not comply with the Putative Father Registry provisions, the "plain language of the statute prohibits J.S.A. from intervening in the

adoption action and from initiating the parentage action." 361 Ill. App. 3d at 749.

The appellate court also rejected J.S.A.'s argument that section 8(a)(1) of the Parentage Act (750 ILCS 45/8(a)(1) (West 1998)) provides a 20-year statute of limitation within which he may petition to establish a parent-child relationship. The appellate court, reading section 8(a)(1) of the Parentage Act "in tandem" with the Putative Father Registry provisions contained within section 12.1 of the Adoption Act, concluded that the statutes "require that a putative father first satisfy the Registry requirement in order to initiate a parentage petition." 361 Ill. App. 3d at 749. Based upon this reading of the relevant statutory provisions, the appellate court determined that "[b]ecause J.S.A.'s failure to satisfy the Registry requirement barred him from pursuing a parentage petition, all orders entered in the parentage proceeding are void *ab initio*, including the order declaring J.S.A. the child's biological father and this court's opinion previously issued in the parentage action." 361 Ill. App. 3d at 749.

This court granted J.S.A.'s petition for leave to appeal. 177 Ill. 2d R. 315(a). We subsequently allowed the Illinois Attorney General and the Department of Healthcare and Family Services to intervene as appellants in this case.

## ANALYSIS

At the outset, we note that this cause has been unduly complicated by the fact that the parties have engaged in an extraordinary amount of litigation in the circuit and the appellate courts, with much of it being contradictory, inconsistent and incoherent. By filing his parentage petition, J.S.A. apparently set in motion an onslaught of legal maneuvering that has resulted in the filing of internally inconsistent pleadings, as well as the filing of pleadings that are at odds with each other. For example, after J.S.A. filed his action to declare a father-child relationship in the circuit court in September 1999, six weeks later the marital couple filed a "Petition to Adopt Related Child" in which they named J.S.A. as a respondent and in which it was alleged that "plaintiff, [M.H.], is the biological mother of the child sought to be adopted herein" and that her husband, W.C.H., "is the biological father of the child sought to be adopted herein."

-8-

These statements, alone, give us pause, as it is highly unusual for two persons alleging that they are the "biological parents" of a child and who have never lost rights to that child to file a legal proceeding to adopt their own natural child.

Nevertheless, after stating that W.C.H. is the "biological father" of the child, the marital couple thereafter make the following inconsistent allegation in the adoption petition: "Further, [W.C.H.] is presumed to be the natural father of [W.T.H.], inasmuch as [the marital couple] are and have been married to each other *** and that irrespective of whether or not he is the biological father of the minor child sought to be adopted, he is in fact the psychological, apparent and/or equitable father of said child." Later in the adoption petition, the marital couple allege that J.S.A. is an "unfit" person to have W.T.H. because, *inter alia*, J.S.A. "evidence[d] his intent to forgo his parental rights, as manifested by his failure *** [t]o commence legal proceedings to establish his paternity under the Illinois Parentage Act of 1984." Again, we note that the marital couple allege that J.S.A. had not "commenced" legal proceedings under the Parentage Act even though he had filed a parentage action six weeks prior to the filing of their adoption petition. We also question why M.H. and W.C.H. alleged in their adoption action that J.S.A. was "unfit" and showed an "intent to forgo his parental rights" when no judicial determination had been made that J.S.A. was, in fact, the biological father of W.T.H., and in light of the fact that they maintained the position that it was W.C.H.–and not J.S.A.–who was the biological father of W.T.H.

Other pleadings filed in this cause evince similar infirmities. For example, on the same day that M.H. and W.C.H. filed their adoption action, they also filed a petition to terminate the parental rights of J.S.A. to the minor child. In this pleading, they characterize J.S.A. as an "unfit parent," doing so, again, despite the fact that no legal determination had been rendered that J.S.A was the biological father of W.T.H.. In addition, the marital couple requested that the court "terminate" J.S.A.'s "parental rights," even though the circuit court had not declared that J.S.A. had any parental rights to W.T.H. in the first instance. We further note that the petition to terminate J.S.A.'s parental rights is inconsistent with the marital couple's petition to adopt W.T.H. because, as stated, in the adoption petition M.H. and

W.C.H. claim to be the sole biological parents of W.T.H., while in the termination petition, they claim that J.S.A. has "parental rights" which must be "terminated."

These are only a few examples of the tumultuous litigation history we have discovered as a result of our examination of the record in this cause. We highlight these instances because we are seriously troubled by the course of the litigation in this matter. Since this matter is being remanded, we take this opportunity to note, in general, that the trial court possesses the inherent authority to control its own docket and the course of litigation, including the authority to prevent undue delays in the disposition of cases caused by abuses of the litigation process. See *Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 66 (1995); *Bejda v. SGL Industries, Inc.*, 82 Ill. 2d 322, 328 (1980). We are not unmindful that this case concerns the future of a young child, where the specter of delay is especially troublesome.

We now turn to the merits of the instant cause. The issue presented by this appeal is a narrow one: whether the appellate court erred in holding that it lacked jurisdiction to hear an interlocutory appeal in this case and subsequently vacating all orders previously entered by the circuit court in the parentage action as being "void *ab initio*" because J.S.A. sought to establish a parent-child relationship pursuant to the provisions of the Parentage Act without first registering as a putative father within 30 days of the child's birth pursuant to the Putative Father Registry provisions contained in the Adoption Act. The resolution of the question raised in the instant appeal requires us to interpret the relevant statutory provisions found within the Parentage Act and the Adoption Act. Because the construction of a statute is a question of law, we review the merits of this cause *de novo. Wisniewski v. Kownacki*, 221 Ill. 2d 453, 460 (2006).

The applicable rules of analysis are familiar. It is well settled that in construing the meaning of a statute, the primary objective of this court is to ascertain and give effect to the intent of the legislature. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). All other rules of statutory construction are subordinate to this cardinal principle. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 279 (2003). In determining the intent of the General Assembly, we begin by examining the language of the statute,

which is the most reliable indicator of the legislature's objectives in enacting a particular law. *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001). The statutory language must be afforded its plain and ordinary meaning (*In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002)), and, where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. *In re D.S.*, 217 Ill. 2d 306, 313 (2005). We will not depart from the plain language of a statute by reading into it exceptions, limitations or conditions that conflict with the express legislative intent. *Petersen v. Wallach*, 198 Ill. 2d 439, 446 (2002). In construing a statute, we presume that the General Assembly, in enacting legislation, did not intend absurdity, inconvenience or injustice. *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 40 (2001).

One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole. *In re Donald A.G.*, 221 Ill. 2d 234, 246 (2006). Accordingly, words and phrases must be interpreted in light of other relevant provisions of the statute and must not be construed in isolation. *Michigan Avenue National Bank*, 191 Ill. 2d at 504. We clarify, however, that where–as in the instant cause–there are two separate statutory enactments to be construed, this rule of construction does not mean that the provisions of the two separate enactments are to be construed together as a whole. To the contrary, we must construe each enactment separately, and only view the provisions within each enactment as a whole. Therefore, in the matter at bar, we will separately construe each of the relevant statutory enactments. First, we will construe the provisions of the Parentage Act (750 ILCS 45/1 *et seq.* (West 1998)) as a whole. Thereafter, we will construe the Putative Father Registry provisions. We note that the Putative Father Registry is not an enactment unto itself but, rather, is wholly contained within section 12.1 of the Adoption Act (750 ILCS 50/1 *et seq.* (West 1998)). Accordingly, we will construe the provisions of the Adoption Act as a whole. We will then consider the interplay between these two statutory enactments.

In enacting the Parentage Act, the General Assembly established a "statutory mechanism that serves to legally establish parent and child relationships in Illinois." *In re Estate of Poole*, 207 Ill. 2d 393, 404 (2003). In section 1.1 of the Parentage Act, the General Assembly declares that the purpose of this statutory enactment is to further the

public policy of Illinois to "recognize[ ] the right of every child to the physical, mental, emotional and monetary support of his or her parents under this Act." 750 ILCS 45/1.1 (West 1998); see also *In re Parentage of John M.*, 212 Ill. 2d 253, 263 (2004). The provisions of the Parentage Act underscore that the importance of parentage hinges upon the rights and responsibilities that are attendant to the parent and child relationship. As such, the Parentage Act defines the term "parent and child relationship" as "the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations." 750 ILCS 45/2 (West 1998).

The Parentage Act provides that "[t]he parent and child relationship *** extends equally to every child and to every parent, regardless of the marital status of the parents." 750 ILCS 45/3 (West 1998). Accordingly, under the Parentage Act, a father-child relationship may be established in a number of ways: by presumption (750 ILCS 45/5(a) (West 1998)), by consent (750 ILCS 45/6 (West 1998)), or by judicial determination (750 ILCS 45/7 (West 1998)); *In re Parentage of John M.*, 212 Ill. 2d at 263. Pertinent to the matter before us, section 5(a)(1) of the Parentage Act provides that a man is presumed to be the natural father of a child if "he and the child's natural mother are or have been married to each other, even though the marriage is or could be declared invalid, and the child is born or conceived during such marriage." 750 ILCS 45/5(a)(1) (West 1998). The statute further provides, however, that this presumption is not conclusive and may be rebutted by clear and convincing evidence. 750 ILCS 45/5(b) (West 1998). Section 7(a) of the Parentage Act expressly provides that a man alleging that he is the father of a child has standing to bring an action to establish his relationship with that child, even if another man is already presumed to be the child's father pursuant to section 5(a) of the Act. 750 ILCS 45/7(a) (West 1998) ("An action to determine the existence of the father and child relationship, whether or not such a relationship is already presumed under Section 5 of this Act, may be brought by *** a man *** alleging himself to be the father of the child or expected child"). The Parentage Act allows a putative father to establish his parentage of a child up until the child attains the age of 20. 750 ILCS 45/8(a)(1) (West 2000) ("An action brought by *** a party alleging that he ***

-12-

is the child's natural parent *** shall be barred if brought later than 2 years after the child reaches the age of majority").

The Parentage Act also sets forth the procedure for establishing a father-child relationship. The statute provides that a man has a right to request DNA testing to determine if he is the biological father of the child, and that the circuit court must order the parties to submit to testing upon the man's request. 750 ILCS 45/11(a) (West 1998) ("As soon as practicable, the court *** may, and upon request of a party shall, order or direct the mother, child and alleged father to submit to deoxyribonucleic acid (DNA) tests to determine inherited characteristics"). The Parentage Act further provides that "[i]f any party refuses to submit to the tests, the court may resolve the question of paternity against that party or enforce its order if the rights of others and the interests of justice so require." 750 ILCS 45/11(a) (West 1998). If the results of the genetic testing ordered pursuant to this section show that the presumed father is not the child's biological father, the presumption in section 5 of the Act is rebutted. 750 ILCS 45/11(g) (West 1998). However, even though DNA testing may establish the man's paternity of the child, this does not mean that the biological father will be automatically granted parental rights to the child. Rather, any parental rights of the biological father, such as the right to have visitation with, or custody of, the child will only be granted upon a showing that such a grant is in the best interests of the child. Section 14(a)(1) of the Parentage Act provides that any decision regarding custody and visitation of the child "shall [be] determine[d] in accordance with the relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act [750 ILCS 5/101 *et seq*.] and any other applicable law of Illinois, to guide the court in a finding in the best interests of the child." 750 ILCS 45/14(a)(1) (West 1998).

We now turn to a review of the provisions contained within the Putative Father Registry enactment. Section 12.1 of the Adoption Act created the Putative Father Registry, which is maintained by the Department of Children and Family Services. 750 ILCS 50/12.1 (West 1998). As stated, the Putative Father Registry does not stand alone; rather, all of the requirements of the Putative Father Registry are contained within section 12.1 of the Adoption Act and are to be read in that context. The General Assembly has explicitly declared that the purpose of the Putative Father Registry is to "determin[e] the identity

and location of a putative father of a minor child who is, or is expected to be, the subject of an adoption proceeding, in order to provide notice of such proceeding to the putative father." 750 ILCS 50/12.1 (West 1998). Subsection (b) of section 12.1 allows a putative father to register before the birth of the child, but mandates that he "shall register no later than 30 days after the birth of the child." 750 ILCS 50/12.1(b) (West 1998). Subsection (g) of that provision further provides:

> "Except as provided in subsections (b) or (c) of Section 8 of th[e] [Adoption] Act, a putative father who fails to register with the Putative Father Registry as provided in this Section is barred from thereafter bringing or maintaining any action to assert any interest in the child, unless he proves by clear and convincing evidence that:
>
> > (1) it was not possible for him to register within the period of time specified in subsection (b) of this Section; and
> >
> > (2) his failure to register was through no fault of his own; and
> >
> > (3) he registered within 10 days after it became possible for him to file.
>
> A lack of knowledge of the pregnancy or birth is not an acceptable reason for failure to register." 750 ILCS 50/12.1(g) (West 1998).

In turn, section 8(b) of the Adoption Act sets forth the conditions under which a father may provide or withhold consent for the adoption. If the father was married to the mother on or within 300 days prior to the date of the child's birth he has a right to provide or withhold consent. 750 ILCS 50/8(b)(1)(B)(i) (West 1998). In addition, if he is "the father of the child under a judgment for adoption, an order of parentage, or an acknowledgment of parentage or paternity pursuant to subsection (a) of Section 5 of the Illinois Parentage Act of 1984" he may provide or withhold consent to the adoption. 750 ILCS 50/8(b)(1)(B)(ii) (West 1998). Further, a father may provide or withhold consent to the adoption if he has "timely registered with [the] Putative Father Registry, as provided in section 12.1 of th[e] [Adoption] Act, and prior to the expiration of 30 days

-14-

from the date of such registration, commenced legal proceedings to establish paternity under the Illinois Parentage Act of 1984 or under the law of the jurisdiction of the child's birth." 750 ILCS 50/8(b)(1)(B)(vii) (West 1998). Section 8(b) additionally provides differing standards with respect to whether the child sought to be adopted is more or less than six months of age when placed with the adoptive parents. If the child sought to be adopted is less than six months old when placed with the adoptive parents, fathers who establish that they satisfy one of the following criteria must be notified of any adoption and be provided with the legal right to provide or withhold consent: during the first 30 days after the birth of the child, he openly lived with the mother and/or child and held himself out to be the child's father (750 ILCS 50/8(b)(1)(B)(iii) (West 1998)); or the father made a good-faith effort to pay birth expenses and child support before the child was 30 days old (750 ILCS 50/8(b)(1)(B)(iv) (West 1998)). If the child was more than six months old when placed with the adoptive parents, then the father must meet one of the following categories to retain his right to provide or withhold consent to the adoption: he maintained contact with the child, as shown by the payment of child support, and he engages in monthly visitation or regular communication with the child or the child's legal custodian (750 ILCS 50/8(b)(1)(B)(v) (West 1998)); or, during six months of the one-year period immediately preceding the child's placement for adoption, he openly lived with the child and held himself out to be the child's father. 750 ILCS 50/8(b)(1)(B)(vi) (West 1998).

In the case at bar, J.S.A., relying upon the statutory right granted him under section 7(a) of the Parentage Act (750 ILCS 45/7(a) (West 1998)), filed a petition in the circuit court of Will County on September 9, 1999, seeking a judicial determination of his paternity of W.T.H, who was approximately 3½ years of age at that time. The language of the Parentage Act is clear and unambiguous. The Parentage Act allows a putative father such as J.S.A. to establish the parentage of a child up until the child attains 20 years of age. 750 ILCS 45/8(a)(1) (West 1998). It is uncontroverted that J.S.A. filed his petition to determine a father-child relationship with W.T.H. within the statute of limitation contained in section 8(a)(1) of the Parentage Act. In addition, the provisions contained within section 7(a) of the Parentage Act (750 ILCS 45/7(a) (West 1998)) are clear and

-15-

unambiguous that there is no bar against a man–such as J.S.A.–to prevent him from alleging that he is the father of a child even if another man is already presumed to be the child's father pursuant to section 5(a) of the Parentage Act. See 750 ILCS 45/5(a) (West 1998). Indeed, section 5(b) of the Parentage Act (750 ILCS 45/5(b) (West 1998)) provides that a presumption arising under section 5(a) is not conclusive and may be rebutted by clear and convincing evidence–evidence such as DNA test results establishing that another man is, in fact, the child's biological father. See 750 ILCS 45/11(g) (West 1998). Finally, the language of the Parentage Act is clear and unambiguous that once a man seeking to establish a father-child relationship files a petition to determine parentage pursuant to the Parentage Act and requests DNA testing, the circuit court must order that such tests be performed. 750 ILCS 45/11(a) (West 1998). Accordingly, we find that J.S.A. filed a valid petition to determine a father-child relationship under the Parentage Act.

However, M.H. and W.C.H. in their brief to this court–and the appellate court in its opinion below–assert that in the case before us it is improper to read the provisions of the Parentage Act in isolation. To the contrary, they assert that the Parentage Act provisions must be read in conjunction with the Putative Father Registry requirements contained within section 12.1 of the Adoption Act (750 ILCS 50/12.1 (West 1998)). Based upon their interpretation of the interplay between the provisions contained within these two separate statutes, M.H. and W.C.H. contend that the appellate court properly determined that it lacked jurisdiction to consider their appeal–and appropriately vacated all orders in the past seven years in the parentage action as void *ab initio*–because J.S.A. failed to file with the Putative Father Registry. We reject these contentions.

Looking, as we must, to the plain language of both the Parentage Act and the Putative Father Registry provisions, we begin by observing that the General Assembly specifically set forth separate and unique public policy purposes for each enactment. With respect to the Parentage Act, the legislature stated that the public policy purpose of that statute is to further the "right of every child to the physical, mental, emotional and monetary support of his or her parents under this Act." 750 ILCS 45/1.1 (West 1998). In other words, in enacting the Parentage Act the General Assembly intended to establish a

-16-

statutory scheme whereby a court determines who is the parent of the child in the eyes of the law, which, in turn, implicates the rights and responsibilities of that person *vis-a-vis* the child with respect to physical, emotional and financial support. To further this important objective, the Parentage Act contains a long-term statute of limitation, which allows a man to institute parentage proceedings until the child reaches 20 years of age. 750 ILCS 45/8(a)(1) (West 1998).

In contrast, the legislature has explicitly stated that the purpose of the Putative Father Registry is to "determin[e] the identity and location of a putative father of a minor child who is, or is expected to be, the subject of an adoption proceeding, in order to provide notice of such proceeding to the putative father." 750 ILCS 50/12.1 (West 1998). The Putative Father Registry provisions contain a short-term window for registration (750 ILCS 50/12.1(b) (West 1998)), and the plain language of the Registry provisions state that they apply only in those instances where an adoption is pending, or where it is expected that there will be an adoption. The Putative Father Registry provisions purport "only to ensure that a putative father, who registers promptly, that is, within the time limits specified in the statute, is notified of adoption proceedings so that he can assert his parental rights while those proceedings are pending." (Emphasis omitted.) *In re Petition to Adopt O.J.M.*, 293 Ill. App. 3d 49, 57 (1997). The registration requirement thereby "avoids the injection of uncertainty and instability into the adoption process" and promotes the finality and stability of adoptions. *In re Petition to Adopt O.J.M.*, 293 Ill. App. 3d at 57.

The plain meaning of the language employed by the General Assembly in each enactment could not be clearer: each statute has a specific and distinct purpose which does not generally overlap with the other, and each applies in different factual situations. We find that not only are the specific facts which trigger the application of the Putative Father Registry provisions nonexistent in the matter before us, but also that the specific purpose of the Putative Father Registry is not furthered by requiring J.S.A. to comply with its provisions. The case before us does not present a situation where, in direct response to a pending, *bona fide* adoption action, a putative father is attempting to establish parentage in an effort to bring himself within section 8(b)(1)(B) of the Adoption Act (750 ILCS 50/8(b)(1)(B) (West 1998)), which provides that an order of parentage allows him the right

to withhold consent to the adoption. Such a situation injects into the adoption proceedings the exact type of uncertainty, instability and threat to finality intended to be eliminated by the provisions of the Putative Father Registry. Instead, the factual situation in the instant cause presents the exact *opposite* of that situation.

The record in the instant appeal establishes that J.S.A. was the *first* party to initiate judicial proceedings in the circuit court of Will County by filing a petition to establish a father-child relationship with W.T.H. under the Parentage Act. It was only *after* J.S.A. filed his paternity action under the Parentage Act that M.H. and W.C.H. commenced adoption proceedings with respect to W.T.H.–apparently doing so in direct response to J.S.A.'s earlier parentage petition. Thus, at the time that J.S.A. filed his parentage petition, no action for the adoption of W.T.H. was pending in the circuit court. Further, no reasonable argument can be raised that J.S.A. would "expect" that M.H. and W.C.H. would file an adoption action with respect to W.T.H., as M.H. is the natural mother of the child and as W.C.H. took the position–even in the adoption petition itself–that he was the child's biological father. Accordingly, the factual situation present here does not trigger the requirements of the Putative Father Registry, because W.T.H. was neither the subject of a pending adoption proceeding nor expected to be the subject of such a proceeding at the time J.S.A. filed his parentage action. See 750 ILCS 50/12.1 (West 1998).

In addition, the purposes of neither statute would be furthered by imposing such a requirement here. In the matter before us, J.S.A. petitioned the court to establish parentage and, in response, the marital couple attempted to thwart his parentage action by instituting adoption proceedings six weeks later for a child that they had in their custody for nearly four years. Imposing the requirement that J.S.A. was mandated to comply with the provisions of the Putative Father Registry as a prerequisite to filing his parentage action under these facts would certainly not further either statute's objectives, especially that of the Putative Father Registry to provide notice of adoption proceedings to the putative father. As stated, in this case the adoption proceedings were instituted *in response* to J.S.A.'s parentage petition,

and there was no question that all parties were aware of J.S.A.'s identity and his contention that he is the biological father of W.T.H.[1]

In sum, the plain language of both the Parentage Act and the Putative Father Registry provides no indication that the Putative Father Registry provisions were intended by the General Assembly to apply to filings under the Parentage Act when there is no adoption action pending or contemplated at the time a parentage petition is filed. Although our decision is based upon the plain language of the statute, we observe that our conclusion is consistent with the legislative history of the Putative Father Registry. The Putative Father Registry found its genesis in the aftermath of this court's decision in *In re Petition of Doe*, 159 Ill. 2d 347 (1994), commonly known as the "Baby Richard" case. The Putative Father Registry provisions were included as part of House Bill 2424, which was enacted as Public Act 88–950 on July 3, 1994–only 17 days after this court's decision in *Doe*. Pub. Act 88–550, eff. July 3, 1994; see also *In re Petition to Adopt O.J.M.*, 293 Ill. App. 3d at 54-55 (discussing the history of the Putative Father Registry requirements and that the statute was enacted in response to the "Baby Richard" decision); S. Bostick, *The Baby Richard Law: Changes to the Illinois Adoption Act*, 82 Ill. B.J. 654 (1994) (same).

The legislative debates on House Bill 2424 reinforce the notion that the main objectives of the Putative Father Registry are to provide timely notice to a putative father in adoption proceedings and to avoid uncertainty and ensure finality in those actions. In one example,

---

[1]We note that in their written submission to this court, M.H. and W.C.H. rely upon the appellate court's decision in *In re Petition to Adopt O.J.M.*, 293 Ill. App. 3d 49 (1997), to support their argument that a putative father's failure to comply with the provisions of the Putative Father Registry prevents him from pursuing a parentage action. *O.J.M.*, however, is factually distinguishable from the matter before us. Although the court in *O.J.M.* held that the failure of the putative father to register barred him from proceeding in the parentage action, in that case an adoption petition had previously been filed and was pending at the time the putative father filed his parentage petition. Therefore, in that case, it appears that the putative father instituted the parentage action with the intent to gain standing as a party in the adoption proceedings–precisely the type of situation meant to be addressed by the provisions of the Putative Father Registry.

Representative Dart explained the purpose of the enactment as follows:

> "[T]he thrust of the Bill *** what its attempting to do is to put some type of ... some finality and some type of predictability into our adoption laws as they exist right now. As the 'Baby Richard' case [has] highlighted to many people, there are some major problems here. *** The provisions here set up a registry, a registry for parents so that a biological father does not have to worry about the fact that he might run into some type of problem or disagreement with the biological mother [because] [he] will have the opportunity to sign on to a registry so that his rights will be ensured." 88th Ill. Gen. Assem., House Proceedings, June 30, 1994, at 105 (statements of Representative Dart).

Representative Wojcik also spoke in support of the bill and described its purpose as follows:

> "What this does is give protection to both the biological parents and the adopt[ive] parents. It is not jeopardizing either group. What its doing is having accountability for who the father is and [his] identity. So that in the long run, the child who is adopted is not going to be taken out of its protective home and put in a strange home. *** It's the beginning to stop some of the problems that we are looking at [in] adoptions. We do not want to hinder the process, we do not want to hurt the biological parents. But I think it's a protection mechanism for both parties ***." 88th Ill. Gen. Assem., House Proceedings, June 30, 1994, at 115 (statements of Representative Wojcik).

These brief examples from the legislative debates underscore that by enacting the Putative Father Registry requirements, there is every indication that the General Assembly intended to change the law of *adoption*, and no indication whatsoever that the intent was to change the law of parentage and create a new prerequisite to the institution of a parentage action where no adoption action is pending or expected at the time of the filing of the parentage petition. Although a man's failure to register with the Putative Father Registry within 30 days of a child's birth has significant consequences if that child is the subject of an *adoption*, such failure does not otherwise affect a man's ability

-20-

to establish parentage under the Parentage Act. We further note that the General Assembly did not amend the Parentage Act when it amended the Adoption Act by adding the Putative Father Registry provisions. This further indicates that by enacting the Putative Father Registry provisions the legislature intended to change the law of *adoption*.

Accordingly, we hold, under the specific facts of this case, that the ruling of the appellate court below–that a man must first satisfy the requirements set forth in the Putative Father Registry provisions of the Adoption Act in order to initiate an action to establish a parent-child relationship under the Parentage Act where no adoption is pending or contemplated–is contrary to the stated legislative purpose of both the Parentage Act and the Putative Father Registry provisions, to the plain language of the statutes, and to the sound social policy set forth in each enactment. We know of no rule of statutory construction that allows a court to declare that the legislature did not mean what the plain language of a statute imports. *In re Estate of Poole*, 207 Ill. 2d at 402. There is simply no indication in the plain language of either the Putative Father Registry provisions or the Parentage Act that the General Assembly intended under the facts presented in this appeal for the Putative Father Registry provisions in the Adoption Act to limit the provisions contained within the Parentage Act.

Indeed, if we were to hold otherwise and adopt the arguments advanced at bar by M.H. and W.C.H.–and if we were to take those arguments to their logical conclusion–no biological father could ever bring a petition to establish a father-child relationship if he failed to register with the Putative Father Registry within 30 days of the child's birth. Indeed, M.H. and W.C.H. would have us require that *every* unwed father register with DCFS under the Putative Father Registry, even if that man would have no reason to believe those requirements would apply to his circumstances. We find that such an interpretation would frustrate the intent of the General Assembly in enacting the Parentage Act, and would create absurd results which could not have been intended by the legislature when it enacted the Putative Father Registry. It is axiomatic that, in construing a statute, we presume that the General Assembly did not intend absurdity, inconvenience or injustice in enacting the statute. *Burger*, 198 Ill. 2d at 40.

In sum, we hold that the appellate court below erred in determining, under the specific facts presented in the instant cause, that "a putative father [must] first satisfy the [Putative Father] Registry requirement in order to initiate a parentage petition." 361 Ill. App. 3d at 749. Based upon its flawed reading of the relevant statutes, the appellate court not only incorrectly determined that it lacked jurisdiction to hear the interlocutory appeal filed by M.H. and W.C.H., but also erred in holding that it was compelled to find that all orders entered by the circuit court in the seven-year history of J.S.A.'s parentage action were "void *ab initio*," including the circuit court's order of April 28, 2005, which found J.S.A. to be the biological father of W.T.H., as well as the appellate court's prior published decision in *J.S.A. I. J.S.A. II*, 361 Ill. App. 3d at 749. We have repeatedly admonished that in declaring a prior order to be void, a court must be mindful that it is setting aside a final judgment based upon a collateral attack, and " ' "[b]ecause of the disastrous consequences which follow when orders and judgments are allowed to be collaterally attacked, orders should be characterized as void only when no other alternative is possible." ' " *Ford Motor Credit Co. v. Sperry*, 214 Ill. 2d 371, 380 (2005), quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 341 (2002), quoting *In re Marriage of Vernon*, 253 Ill. App. 3d 783, 788 (1993). We repeat this caution once again to our lower courts with today's opinion.

As a final matter, we note that M.H. and W.C.H. argue in their written submission to this court that once a declaration of paternity occurs as a result of DNA testing ordered pursuant to the Parentage Act, the very fact that the parentage petitioner is now legally recognized as the child's father will adversely affect and disrupt the life of the child, as the man in all likelihood will want to be involved in the child's life as his "father." We find that this argument misses the mark. As we have recently explained, the right of a biological father to establish paternity to a child born to a marriage does not also mean that the legal rights flowing from the parent and child relationship are automatically conferred. *In re Parentage of John M.*, 212 Ill. 2d at 264-65. As stated, the Parentage Act specifically provides in section 14(a)(1) that decisions regarding the involvement of the biological father in the life of the child are to be governed solely by what is in the child's best interests. 750 ILCS 45/14(a)(1) (West 1998) (decisions regarding custody and visitation "shall [be] determine[d] in

accordance with the relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act [750 ILCS 5/101 *et seq.*] and any other applicable law of Illinois, to guide the court in a finding in the best interests of the child"); *In re Parentage of John M.*, 212 Ill. 2d at 265. Accordingly, "even though paternity may be established upon the filing of a petition pursuant to section 7(a), any parental rights of the biological father, such as the right to have custody of, or visitation with, the child, shall not be granted unless it is in the child's best interest." *In re Parentage of John M.*, 212 Ill. 2d at 269-73.

Therefore, under this statutory scheme, subsequent to the circuit court's declaration of paternity that court is required to conduct a best-interests hearing to determine whether, and to what extent, the natural father may exercise any rights with respect to the child. At such time, both parties may introduce evidence either in support of, or in opposition to, the natural father being granted parental rights to his biological child.


CONCLUSION

For the foregoing reasons, we vacate the judgment of the appellate court. We remand this cause to the appellate court for that court's consideration of the issues raised in the interlocutory appeal filed by M.H. and W.C.H. with the appellate court on September 2, 2004. We make clear that our decision today has the effect of reinstating all previous rulings in the circuit court which were declared to be void *ab initio* by the appellate court in *J.S.A. II.* In addition, our decision today also reinstates the appellate court's decision in *J.S.A. I.* The appellate court may take judicial notice that there have been various orders entered in the circuit court during the pendency of the appeal, and, as a result, some of the issues in this appeal may be moot. This, however, does not prevent the appellate court from considering the appeal in the first instance.


*Appellate court judgment vacated;*
*cause remanded.*


JUSTICE FITZGERALD took no part in the consideration or decision of this case.