2018 IL App (2d) 170532
No. 2-17-0532
Opinion filed April 27, 2018

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| DEE J., | ) | of Winnebago County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 14-D-1115 |
| | ) | |
| ASHLIE J., | ) | Honorable |
| | ) | Joseph J. Bruce, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Presiding Justice Hudson and Justice Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    This case presents a challenge to the trial court's determination that the nonbiological parent in a same-sex marriage was legally the parent of a child conceived through artificial insemination. We affirm the judgment of the trial court.

¶ 2    The parties, Dee J. and Ashlie J., are a same-sex couple who were married in Iowa in 2009. They were living in Illinois in 2014 when Dee gave birth to a baby girl, A.M.J., who was conceived through artificial insemination. Seven months after A.M.J. was born, the parties separated, and Dee petitioned to dissolve her marriage to Ashlie. Dee's initial dissolution petition stated that A.M.J. was born of the marriage; however, Dee ultimately filed an amended petition, alleging that A.M.J. was not a child of the marriage, and filed a petition seeking a declaration of

the nonexistence of a parent-child relationship between A.M.J. and Ashlie. See generally 750 ILCS 46/205 (West Supp. 2015). Conversely, Ashlie sought a declaration of her parent-child relationship with A.M.J., as well as a judgment allocating decision-making responsibilities and parenting time between the parties. Specifically, Ashlie asserted that her parental and visitation rights were based on the common-law theories of marital contract and promissory estoppel.

¶ 3    The trial court held a hearing on the issue of A.M.J.'s parentage. After the hearing, the court declared that there was a parent-child relationship between Ashlie and A.M.J. and issued a four-page, single-spaced memorandum opinion setting forth its findings. Dee attempted to directly appeal the trial court's parentage order; however, we dismissed her appeal, as a parentage determination is not a final and appealable order in its own right. *Department of Public Aid ex rel. K.W. v. Lekberg*, 295 Ill. App. 3d 1067, 1071 (1998); *Baldassone v. Gorzelanczyk*, 282 Ill. App. 3d 330, 334 (1996). Afterward, the parties returned to the trial court, and the court entered a judgment dissolving the parties' marriage and a separate judgment allocating parental responsibilities between the parties. Dee has timely appealed from the allocation judgment, which is a final and appealable order. See *Lekberg*, 295 Ill. App. 3d at 1071; *Baldassone*, 282 Ill. App. 3d at 334; see also Ill. S. Ct. R. 304(b)(5) (eff. Mar. 8, 2016). We therefore turn to the merits.

¶ 4    On appeal, Dee challenges the trial court's determination that Ashlie, too, is A.M.J.'s parent. Prior to a number of legislative changes (about which, more below), Illinois's statutory authority did not recognize parental rights where a child was conceived by an unmarried couple through artificial insemination. Illinois courts, however, have accepted common-law claims in such cases, particularly because one's participation in artificial insemination is not some whimsical or trivial act. For example, in *In re Parentage of M.J.*, 203 Ill. 2d 526 (2003), our

supreme court held that parental responsibility may be imposed on an unmarried adult whose "conduct evince[d] actual consent to the artificial insemination [procedure]." *Id.* at 540. As the court explained, "if an unmarried man who biologically causes conception through sexual relations without the premeditated intent of birth is legally obligated to support a child, then the equivalent resulting birth of a child caused by the deliberate conduct of artificial insemination should receive the same treatment." *Id.* at 541. This holding was later extended to situations in which an unmarried same-sex couple had conceived a child through artificial insemination. In *In re T.P.S.*, 2012 IL App (5th) 120176, the court explained that parental responsibility may be imposed or parental rights may be asserted "based on conduct evincing actual consent to the artificial insemination procedure by an unmarried [same-sex] couple along with active participation by the nonbiological partner as a coparent." *Id.* ¶ 41. "To hold otherwise," the court stated, "[would] deny a child his or her right to the physical, mental, and emotional support of two parents merely because his or her parentage falls outside the terms of the Illinois Parentage Act." *Id.* We review a trial court's parentage finding under the manifest-weight standard. See *Milligan v. Cange*, 200 Ill. App. 3d 284, 294 (1990).

¶ 5　　As the trial court determined, under the standards set forth in *In re Parentage of M.J.* and *In re T.P.S.*, the evidence in this case was not close. Indeed, the facts were largely undisputed. Both Dee and Ashlie are Illinois residents and work for a local nonprofit organization in the Rockford area. Dee and Ashlie were, as noted, wed in Iowa in October 2009 (Illinois did not recognize the validity of same-sex marriages until June 1, 2014). After the parties were married, Dee took Ashlie's last name, and the two lived as spouses. They also purchased a home together and agreed to conceive a child through assisted reproduction, or artificial insemination.

¶ 6     The parties agreed that Dee would carry their first child and that, if there were a second child, it would be carried by Ashlie. In March 2012, Dee and Ashlie, as a couple, enrolled in an artificial-insemination program, and Dee began receiving fertility treatments at a clinic. (Throughout the treatment, Ashlie also administered hormone shots to Dee at home.) Together, Dee and Ashlie selected a sperm donor through the clinic's program. They specifically chose a donor whose physical characteristics—*e.g.*, height, mannerisms, and ethnicity—were similar to Ashlie's. In addition, the parties jointly paid for Dee's medical and fertility treatment.

¶ 7     In the fall of 2013, the parties learned that Dee was carrying a little girl. The parties together selected the baby's first name and decided that her middle name would be the same as Ashlie's middle name. Both Dee and Ashlie held a joint baby shower.

¶ 8     A.M.J. was born in a Rockford-area hospital in February 2014. Ashlie was present for A.M.J.'s birth; Dee and Ashlie jointly completed the paperwork for A.M.J.'s birth certificate, and both are identified as "Co-Parent[s]" on A.M.J.'s birth certificate. After A.M.J. was born, Dee and Ashlie sent out a joint birth announcement in their employer's newsletter.

¶ 9     Seven months after A.M.J. was born, the parties separated. However, while the parties were together, there was considerable evidence that Ashlie was actively coparenting A.M.J. After A.M.J. was born, Ashlie took time off work to spend time with the baby and fed, bathed, changed, and bonded with her. After Dee's maternity leave ended, the parties began working alternating shifts and thus took care of A.M.J. in alternating shifts. During this time, Ashlie was A.M.J.'s primary caregiver most nights and weekends. Ashlie also put A.M.J. on her health insurance. Ashlie testified that A.M.J. (nearly three at the time of the hearing) refers to both Dee and Ashlie as "Mom."

¶ 10    Dee testified that she and Ashlie never agreed to conceive a child through artificial insemination; that after A.M.J. was born, Dee and Ashlie never discussed "how happy [they] were to both have this new baby"; and that, because she had been under the influence of medication, Dee did not recall jointly filling out A.M.J.'s birth certificate, which listed Ashlie as a coparent. The trial court found Dee not credible on each point.

¶ 11    On appeal, Dee argues that there was "negligible" evidence of a parent-child bond—or evidence of only a "negligible" parent-child bond—between Ashlie and A.M.J. As the trial court noted, however, even if Dee were correct, in view of A.M.J.'s young age when the parties separated and at the time of the hearing, that point was hardly dispositive. More importantly, as the trial court stated in its memorandum order:

> "A nonbiological parent still retains both her parental responsibilities and rights. A child still retains the right to the physical, mental, emotional and financial support [from] both of her parents. [A.M.J.] was brought into this world because of the decision of both Dee and Ashlie to conceive a child through artificial insemination. She was nurtured for the first seven months of her life by both Dee and Ashlie. These are months when attachments and bonds are formed between an infant and both parents. The evidence shows that both parents were actively involved with [A.M.J] during these months. This was sufficient time for Ashlie to demonstrate the kind of co-parent connection with [A.M.J.] to satisfy the requirements set forth in [*In re Parentage of M.J.* and *In re T.P.S.*] Ashlie did not merely consent to an insemination procedure and then abandon the child who was conceived through that process. She remained involved with [A.M.J.] like a loving parent until marital discord led to the separation of the parties seven months [after A.M.J. was born]."

After carefully examining the record, we agree with the trial court's foregoing statements in all respects. Accordingly, the trial court's determination that a parent-child relationship existed between Ashlie and A.M.J. was *not* against the manifest weight of the evidence.

¶ 12    Dee's remaining arguments assail the judgment for failing to meet two "require[ments]" but, in fact, neither requirement was applicable. First, Dee contends that the trial court erred by not making "specific findings of best interests"—*i.e.*, findings that a parent-child relationship with Ashlie was specifically in A.M.J.'s best interests. We reject the premise, as such findings were not required. Although cited by neither party, our supreme court has twice explained that best-interests findings are a prerequisite to the exercise of parental rights, not a prerequisite to declaring the existence of parental rights. See *J.S.A. v. M.H.*, 224 Ill. 2d 182, 212 (2007); *In re Parentage of John M.*, 212 Ill. 2d 253, 269-73 (2004). In other words, the exercise of parental rights " 'such as the right to have custody of, or visitation with, the child, shall not be granted unless it is in the child's best interest' " (*J.S.A.*, 224 Ill. 2d at 212 (quoting *In re Parentage of John M.*, 212 Ill. 2d at 265)); parentage, however, may be established merely by commencing a legal action to determine that fact.

¶ 13    Dee's remaining point is that, pursuant to the Gestational Surrogacy Act (750 ILCS 47/1 *et seq.* (West 2014)), Ashlie's parentage depended on whether there was "written consent" between the parties to conceive a child through artificial insemination. Because such a document—also known as a "gestational surrogacy contract"—was not in evidence, Dee asserts that the trial court "misapplied the law" and overlooked the "plain language" of the Gestational Surrogacy Act. This argument, too, is misguided. In a traditional surrogacy, a woman uses her own egg (her female gamete) and is artificially inseminated with the intended father's or a donor's sperm (a male gamete). The surrogate mother carries and delivers the child(ren), which

is (or are) then given to the intended parent(s) to raise. Thus, a traditional surrogate is genetically linked to the child because it is her egg that created the child. As the statute explains, in a *gestational* surrogacy, "a woman attempts to carry and give birth to a child created through in vitro fertilization using the gamete or gametes of at least one of the intended parents and to which the gestational surrogate *has made no genetic contribution*." (Emphasis added.) 750 ILCS 47/10 (West 2014). Because there is a biological connection between Dee and A.M.J., Dee was *not* a gestational surrogate for A.M.J. In fact, Dee was not any kind of surrogate for A.M.J. at all, as A.M.J. was conceived for Dee and Ashlie to be A.M.J.'s *parents*. Consequently, the contractual requirements that govern gestational-surrogacy arrangements have absolutely no bearing here.

¶ 14    One final point remains. In her appellee's brief, Ashlie argues that we should affirm on an alternative basis. According to Ashlie, in light of the United States Supreme Court's decision that the fundamental right to marry is guaranteed to same-sex couples (see *Obergefell v. Hodges*, 576 U.S. ___, 135 S. Ct. 2071 (2015)), we must "interpret the 1984 Parentage Act in a gender neutral fashion" and apply to her a spousal presumption of parentage for a child conceived during a marriage. See generally *Michael H. v. Gerald D.*, 491 U.S. 110 (1989); see also *Pavan v. Smith*, 582 U.S. ___, 137 S. Ct. 2075 (2017). We need not consider Ashlie's argument, because in 2014 the legislature repealed the Illinois Parentage Act of 1984 and replaced it with the Illinois Parentage Act of 2015 (see Pub. Act 99-85 (eff. Jan. 1, 2016) (repealing 750 ILCS 45/1 *et seq.* and adding 750 ILCS 46/101 *et seq.*)), and more recently the legislature made a number of technical corrections to the 2015 enactment. See Pub. Act 99-769, § 5 (eff. Jan. 1, 2017) (amending 750 ILCS 46/101 *et seq.*). These legislative alterations obviate the need for us to consider Ashlie's argument, as we cannot grant her any effective relief from a statute that is no

longer in effect. See *Bartlow v. Costigan*, 2014 IL 115152, ¶ 35; see also *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989).

¶ 15    In sum, we affirm the judgment of the circuit court of Winnebago County declaring a parent-child relationship between Ashlie and A.M.J.

¶ 16    Affirmed.