# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Custody of C.C.*, 2013 IL App (3d) 120342

---

| | |
|---|---|
| Appellate Court Caption | *In re* CUSTODY OF C.C., a Minor (Erica L.F., Petitioner-Appellee, v. DAVID H.C., Respondent-Appellant (Klay B., Intervenor-Appellant)). |
| District & No. | Third District<br>Docket No. 3-12-0342 |
| Filed | December 9, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a paternity action where a paternity order was issued by the trial court based on the acknowledgment of paternity executed by respondent the day after the delivery of a child by petitioner and then intervenor sought to vacate that order two years later based on his claim that he was the child's biological father, the trial court refused to vacate the order but did grant intervenor's request for visitation and an order requiring him to pay child support, and further ordered intervenor to pay a portion of the attorney fees petitioner incurred due to the intervention, the award of attorney fees was reversed on appeal based on intervenor's income and the appellate court decided it lacked jurisdiction to consider intervenor's contentions that his motion to vacate the paternity order should have been granted and that the child support order entered against him should have been based on less than 20% of his income because the child had a second legal father. |
| Decision Under Review | Appeal from the Circuit Court of Fulton County, No. 08-F-68; the Hon. Edward R. Danner, Judge, presiding. |
| Judgment | Reversed. |

| Counsel on Appeal | Jeff L. Neigel (argued), of Law Offices of Jeff Neigel, of Canton, for appellant. |
| | |
| | Thomas B. Ewing, and Joan C. Scott (argued), both of Ewing & Scott, of Lewistown, for appellee Erica L.F. |
| | |
| | David H. Coufal, of Astoria *pro se*. |
| | |
| | Joseph C. O'Donnell, of Macomb, guardian *ad litem*. |

| Panel | PRESIDING JUSTICE WRIGHT delivered the judgment of the court, with opinion.<br>Justice Lytton concurred in the judgment and opinion.<br>Justice Schmidt concurred in part and dissented in part, with opinion. |

## OPINION

¶ 1    Petitioner, Erica L.F., initiated this action in 2008 seeking an order determining custody and support for the minor, C.C. Based on Erica's petition, the circuit court of Fulton County issued a paternity order in 2008 determining David H.C. to be the father of C.C. based on Erica and David's voluntary acknowledgment of paternity executed the day after C.C.'s birth. Two years later, the intervenor, Klay B., asked the court to vacate the 2008 order naming David as C.C.'s parent because Klay alleged he was the child's actual biological father. The trial court refused to vacate the 2008 order declaring David to be C.C.'s father, but granted Klay's request to receive court-ordered visitation and his request to be ordered to pay the full statutory percentage of his net income for C.C.'s child support. In 2011, the court further ordered Klay to pay a portion of Erica's attorney fees incurred as a result of Klay's intervention in case No. 08-F-68.

¶ 2    Klay appeals the order requiring him to pay one-third of Erica's attorney fees and refusing to vacate the 2008 order naming David as the legal father of C.C., as requested in Klay's 2009 motion pursuant to section 2-1401 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-1401 (West 2008)). Alternatively, if this court does not set aside the 2008 paternity order naming David as C.C.'s legal father, Klay asks this court to revisit the issue of whether Klay's child support payment should be based on less than 20% of his income since C.C. continues to have another legal father, namely, David.

¶ 3    We reverse the court's award of attorney fees, but decline to address the other issues regarding Klay's section 2-1401 motion and the appropriate percentage for Klay's child support, if any, due to lack of jurisdiction.

¶ 4                                           BACKGROUND

¶ 5          In late 2006 or early 2007, Erica had sexual relations with both David and Klay and became pregnant. Erica initially suggested to Klay that he could be the father of her unborn child. However, a week later Erica told Klay a doctor informed her that it was extremely unlikely that Klay was, in fact, the father of her child. Erica gave birth to C.C. on October 18, 2007. The following day, Erica and David signed a voluntary acknowledgment of paternity (VAP), identifying David as the child's biological father.

¶ 6          On June 18, 2008, Erica filed a "Petition for Child Custody and Child Support," in case No. 08-F-68, requesting the court to enter an order legally designating David as the father of C.C., based on the VAP, pursuant to section 14 of the Illinois Parentage Act of 1984 (the Parentage Act) (750 ILCS 45/14 (West 2008)). On November 6, 2008, the trial court entered an agreed order finding Erica and David to be "the parents of [C.C.]," awarded sole custody to Erica subject to David's scheduled visitation, and settled financial matters such as support, insurance, and tax exemptions.

¶ 7          Erica's relationship with David temporarily ended in 2008. Thereafter, Erica rekindled her relationship with Klay in early 2009, thereby triggering Klay's suspicions that he may be C.C.'s biological father. Consequently, in June 2009, Klay filed a motion, pursuant to section 2-1401, to vacate the orders naming David the father of C.C., in case No. 08-F-68. Klay also initiated an independent action seeking to establish a father-child relationship in case No. 09-F-50 .

¶ 8          On July 9, 2009, Erica filed a motion to strike Klay's section 2-1401 pleading, in case No. 08-F-68, on the grounds that Klay lacked standing to file any pleadings in the paternity action involving David because Klay was not a named party. On July 10, 2009, the trial court granted Klay leave to file a petition to intervene in case No. 08-F-68, and to withdraw his initial section 2-1401 motion. The court also allowed Klay to dismiss his independent parentage action, on July 10, 2009, in case No. 09-F-50.

¶ 9          Next, on July 22, 2009, Klay filed three pleadings in the 2008 paternity action involving David. Klay asserted Erica recently resumed her relationship with David and refused to allow Klay to have continued contact with C.C. Klay's petition to intervene claimed that Erica and David, either fraudulently or based on a material mistake of fact, signed VAP in 2007 for the purpose of depriving Klay of his parental rights to C.C.

¶ 10         Klay's second pleading, a petition to determine the existence of a father-child relationship, asked the court to order deoxyribonucleic acid (DNA) testing to support a subsequent finding that Klay is the biological father of C.C. The petition asked the court to award joint custody to Klay and Erica, naming Erica residential custodian with rights of reasonable visitation for Klay. The petition further requested that the court order C.C.'s last name be changed to Klay's last name. Finally, Klay requested the court to enter an order fixing his child support obligations at "20% of his net income as calculated pursuant to Section 505 of the [Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/505 (West 2008))]."

¶ 11         Klay's third pleading, filed in case No. 08-F-68 on July 22, 2009, was a new motion for

relief from judgment pursuant to section 2-1401 of the Code. 735 ILCS 5/2-1401 (West 2008). Klay's motion alleged that Erica and David, either fraudulently or through a mistake of fact, signed the VAP to deprive Klay of his potential parental rights to C.C. Therefore, Klay requested the trial court to vacate the order entered November 6, 2008, finding Erica and David to be the legal parents of C.C., and any subsequent orders related to David being C.C.'s father. Klay alleged Erica did not contact him before David signed the 2008 VAP, the day after C.C.'s birth, and failed to notify Klay when she filed the paternity action against David, in case No. 08-F-68.

¶ 12    On August 18, 2009, Erica filed a response to Klay's motion to intervene. David also filed an answer objecting to Klay's petition to intervene on August 25, 2009. In Erica's response, Erica objected to Klay's standing to intervene. According to Erica, the statute did not allow a third party to come into court and determine the nonexistence of a previously declared legal father of a child. Further, Erica claimed Klay waived the right to seek paternity or challenge the existing paternity of C.C., since he was informed she was pregnant in 2007.

¶ 13    The court held a hearing on Klay's petition to intervene. The court found Klay knew of Erica's pregnancy when it occurred and also found David was adjudicated as C.C.'s father by court order based on a conclusive acknowledgment of paternity. Therefore, the court initially denied Klay's petition to intervene.

¶ 14    One month after Klay sought to intervene in the 2008 paternity action, David ceased paying court-ordered child support. On September 17, 2009, the court entered an order, as agreed by David and Erica, terminating David's obligation to pay any amount of child support to the State disbursement unit because Erica and David were once again residing together and mutually providing for C.C.

¶ 15    Subsequently, on September 24, 2009, Klay filed a motion to reconsider the denial of his petition to intervene. Erica moved to strike this motion to reconsider, and David joined in that motion. After a hearing, on February 5, 2010, the trial court reconsidered its earlier decision and then orally granted Klay's petition to intervene in case No. 08-F-68. The trial court entered a written order memorializing its oral decision on February 18, 2010. The court also allowed the parties to proceed on Klay's petition to establish the existence of a father-child relationship and his section 2-1401 motion.

¶ 16    On April 28, 2010, pursuant to Rule 308 (Ill. S. Ct. R. 308 (eff. Feb. 26, 2010)), the trial court certified two questions for interlocutory appeal to this court: (1) whether the trial court has subject matter jurisdiction to make a determination as to the existence of a father-child relationship between another putative father where a parent-child relationship had previously been established by a VAP; and (2) whether the presumption of paternity created by a VAP is conclusive as to the intervenor pursuant to the Parentage Act (750 ILCS 45/1 *et seq.* (West 2008)). This court declined to review the certified questions and issued a mandate on August 12, 2010, denying leave to appeal. In the interim, the trial court granted Klay's request for DNA testing on May 10, 2010.

¶ 17    After this appellate court denied the Rule 308 petition for leave to appeal, the court appointed a guardian *ad litem* (GAL) to represent the child's best interests on August 31, 2010. On December 8, 2010, the court received the DNA test results verifying Klay was the

biological father of C.C., but the court did not make a formal finding that Klay was the father of the child at that time. Subsequently, on December 8, 2010, the court held a hearing on Klay's section 2-1401 motion to vacate the 2008 order naming David the father of C.C., as well as Erica's motion to dismiss Klay's section 2-1401 motion.

¶ 18    After previously meeting with Erica, David, Klay, and C.C., the GAL advised the court it was in C.C.'s best interests for all three "parents" to be involved in C.C.'s life for the following reasons. First, C.C. had a close relationship with her mother, who was living with David and the child. Next, David shared a close relationship with C.C. and was the only father figure C.C. had known in her first three years of life. Finally, Klay truly cared about C.C. and he was her biological father.

¶ 19    At the close of the hearing regarding Klay's section 2-1401 motion, the court found that the Parentage Act provided that a VAP established in accordance with statute has the "full force and effect of a judgment entered under this [Parentage Act] and serves as a basis for seeking a Child Support Order without any further proceedings to establish paternity." The court further found that Klay's section 2-1401 motion was, in effect, an attempt to obtain a declaration of the nonexistence of David's parent and child relationship, a cause of action pursuant to section 7(b) of the Parentage Act which can be initiated only by the child, the child's natural mother, or a VAP father. The court concluded that it did not have the authority to grant a third party's section 2-1401 motion under these circumstances, ruling: "The [section 2-1401] motion attempting to invalidate the parent-child relationship established by the VAP is denied." The court further found that no fraud occurred, but there appeared to be a mistake of fact.

¶ 20    After verbally asking Klay about his income in open court, on December 8, 2010, the court temporarily ordered Klay to pay 20% of his income for child support in the amount of $200 per week. Thereafter, on December 28, 2010, the court referred all three parties, Erica, David, and Klay, to attend mediation regarding Klay's visitation schedule with C.C.

¶ 21    On February 14, 2011, following a hearing, the court entered a written order denying Klay's section 2-1401 motion to vacate the 2008 order naming David as C.C.'s father. The court entered a separate written order finding Klay to be C.C.'s biological father and continued the previous order requiring Klay to pay temporary child support at $200 per week pending further review. The order also awarded Klay temporary visitation with C.C. on a biweekly basis, but denied Klay's request to change C.C.'s last name. This order further denied Klay's "prayer that the Court correct 'all erroneous prior orders, findings or documents.' "

¶ 22    On June 29, 2011, Erica filed a petition seeking contribution for payment of her attorney fees from Klay, without reference to David's obligations to share her fees. On July 5, 2011, Klay filed a motion asking the court to find that the statutory guidelines for child support should not apply in the instant case because the child has three legal, able-bodied parents who could support the child.

¶ 23    The court held a hearing on these two motions on July 13, 2011. At the close of the hearing, the court refused to reduce Klay's child support obligation below 20%, denying Klay's motion to deviate downward from the statutory guidelines, and fixed Klay's child

support payments at $150 per week, calculated at the rate of 20% of his current net income. The court determined the order setting Klay's temporary child support at a higher rate beginning on December 8, 2010, resulted in Klay's overpayment of $1,450 in child support to Erica. Accordingly, the court ordered $10 should be deducted each week from Klay's child support until the overpayment was satisfied. The court also entered an "Agreed Visitation Order" at this hearing, which extended Klay's visitation with the minor. At the close of this hearing, the court noted on the record that two remaining matters existed: whether to allow overnight visitation for Klay and how C.C. was responding to the current visitation schedule. The court scheduled a hearing on these two matters for September 19, 2011.

¶ 24    Based on its July 13 oral ruling, the court entered a written "Uniform Order for Support" on July 28, 2011, for wage withholding purposes. The court entered a final written order, on August 5, 2011, reflecting the totality of its oral ruling after the July 13 hearing.

¶ 25    On September 19, 2011, by agreement of the parties, the court entered an order allowing supplemental overnight visitation with C.C. as requested by Klay. In the same order, the court set the hearing date for the GAL's petition for fees and Erica's petition for contribution for her attorney fees for the date of October 17, 2011. On September 19, 2011, Erica also filed a petition to compel Klay to pay one-half of C.C.'s medical and related expenses that were not covered by insurance.

¶ 26    On October 17, 2011, the court entered an order resolving Erica's request for contribution for the child's unpaid medical expenses by requiring both David and Klay to split the additional expenses equally. The court also entered an order requiring Erica to pay $500 of the GAL fees, totaling $4,088.50, and directed both David and Klay to pay $1,794.25 each, representing equal shares of the remaining balance. The court's October 17, 2011, order resolved all pending motions and petitions with the exception of Erica's petition for contribution toward her attorney fees filed on June 29, 2011. The court directed Erica's counsel to prepare a written order.

¶ 27    On October 28, 2011, Erica's attorney sent a letter to opposing counsel with the attached proposed order concerning GAL fees for opposing counsel's signature. This letter also proposed a settlement of the issues related to Erica's petition for contribution for attorney fees. In addition, on the same date, Erica's counsel sent all parties a notice of hearing to enter the order from the October 28, 2011, hearing and to schedule the hearing on the issue of attorney fees to be heard by the trial judge on January 11, 2012 at 10 a.m. On January 11, 2012, the matter was rescheduled due to illness of counsel and ultimately reset for entry of an order (from the hearing held on October 28, 2011) and for a hearing on Erica's attorney fees petition on March 7, 2012. On February 27, 2012, the court entered the order reflecting its oral ruling from the hearing on October 28, 2011.

¶ 28    The court received testimony from Erica on March 7, 2012, regarding her petition for contribution toward her attorney fees. Erica testified she was an unemployed college student who lived with, and relied on, David, the VAP father, for her financial support. The evidence showed that, at the time of the hearing, Erica had accumulated $19,436 in legal fees and paid approximately $3,000. She alleged she had no ability to pay the remainder of those fees.

¶ 29    David next testified at this hearing, stating his ability to work as a union carpenter was

limited by a herniated disk in his back. At the time of the hearing, David's income consisted of gross unemployment compensation of $552 per week and $2,000 net profit in 2011 from working with his father as a commercial fisherman. David stated he had $4,000 of outstanding medical bills and roughly $11,500 in unpaid legal fees, after already paying his attorney approximately $7,000 to $8,000.

¶ 30    Klay testified he, too, was receiving unemployment compensation after being laid off as a union carpenter. He currently lived with his fiancée and three small boys, one of whom was his biological son with his fiancée. Klay had $3,000 of credit card debt for furniture and over $15,000 in legal fees concerning his paternity status of C.C. He testified he had paid approximately $13,000 toward his attorney fees at the time of the hearing. Klay argued he did not have the financial ability to contribute payments toward Erica's attorney fees.

¶ 31    The court noted that the issue before the trial court presented novel questions involving the fundamental rights of establishing a relationship with a child. The court observed David had stepped forward since the child's birth and raised C.C. as his own, whether she was his biological child or not. The court indicated that Erica told Klay about being pregnant and Klay did not come forward to establish his paternity of the child until much later.

¶ 32    The court also stated it did substantial research of its own and had some concerns about the shortcomings in the Parentage Act and inconsistencies in the authorities. The judge noted he was the one who wanted the appellate court to answer the certified questions in an interlocutory appeal after researching the issues. Based upon the novel question before the court and the complexity of the case, the court found all attorney fees to be reasonable and directed Erica's counsel to prepare the written order for the court's signature.

¶ 33    On March 28, 2012, the court entered a written order directing Klay to pay, within one year, one-third of Erica's attorney fees, totaling $6,438.38. Klay filed his notice of appeal on April 27, 2012, challenging not only the March 28, 2012, order requiring him to pay one-third of Erica's attorney fees, but also challenging previous orders entered on February 14, 2011, and August 5, 2011.

¶ 34    On September 6, 2012, Erica filed a motion with this court to dismiss the entire appeal for lack of jurisdiction due to Klay challenging the orders entered on February 14, 2011, and August 5, 2011, after Klay did not file a notice of appeal within 30 days of those final orders. Klay responded that those orders did not resolve all pending matters, and therefore, they were not final and appealable orders. This court entered a minute order, on October 4, 2012, indicating Erica's motion to dismiss the appeal and Klay's response would be "taken with the case."

¶ 35                                                    ANALYSIS

¶ 36    In this case, Klay filed a notice of appeal on April 27, 2012, challenging three separate rulings by the trial court. First, Klay questions the court's February 14, 2011, order denying Klay's section 2-1401 motion to vacate a previous 2008 paternity order finding David to be C.C.'s father. Second, although Klay agreed the court should order him to pay some amount of his biological daughter's child support, Klay contests the August 5, 2011, order denying his request for a downward departure from the statutory guidelines. Third, Klay submits the

court's March 28, 2012, order erroneously required him to pay one-third of Erica's legal fees without first finding he had the ability to pay those fees. We begin our analysis by reviewing the March 28, 2012, order concerning attorney fees.

¶ 37                                  I. Attorney Fees

¶ 38     On March 28, 2012, the trial court found it was appropriate for Klay to pay one-third, or $6,438.38, of Erica's attorney fees. The court also ordered David to pay one-third of Erica's fees as well.

¶ 39     Klay filed his timely notice of appeal regarding the court's ruling with respect to attorney fees on April 27, 2012. Since this court has jurisdiction to consider this issue raised in Klay's appeal, we decline to allow Erica's motion to dismiss the entire appeal.

¶ 40     The allowance of attorney fees and the amount awarded are matters within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *In re Marriage of Sobieski*, 2013 IL App (2d) 111146, ¶ 37; *In re Marriage of Suriano*, 324 Ill. App. 3d 839, 846 (2001). A trial court abuses its discretion when it acts arbitrarily, without conscientious judgment, or, in view of all of the circumstances, exceeds the bounds of reason and ignores recognized principles of law. *In re Marriage of Bradley*, 2011 IL App (4th) 110392. An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *In re Marriage of Polsky*, 387 Ill. App. 3d 126 (2008).

¶ 41     Section 17 of the Parentage Act authorizes the court to award statutory attorney fees "in accordance with the relevant factors specified in Section 508 of the Illinois Marriage and Dissolution of Marriage Act." 750 ILCS 45/17 (West 2008). The propriety of an award of statutory attorney fees is dependent upon a showing, by the party seeking fees, of an inability to pay and the ability of the other party to do so. *Sobieski*, 2013 IL App (2d) 111146, ¶ 49.

¶ 42     The evidence presented to the court in support of Erica's request for Klay to pay her attorney fees established she accumulated a total of $19,436 in legal fees for purposes of proceeding in this paternity action, including $3,000 Erica previously paid to her attorney. Klay testified he was receiving unemployment compensation; resided with his fiancée and three small boys, including his own biological son; had $3,000 in credit card debt; and owed a balance of $2,000 toward his own $15,000 incurred in attorney fees in this case.

¶ 43     After receiving the evidence, the court suggested Klay should secure a loan for the purpose of paying one-third of Erica's attorney fees. This suggestion implies the court recognized Klay was unable to pay the fees based on his current income. Since the court did not make a specific finding that Klay had the ability to pay Erica's attorney fees and the record does not suggest Klay had the requisite ability to pay, we conclude the trial court abused its discretion by requiring Klay to pay one-third of Erica's attorney fees and reverse that order on this basis alone.

¶ 44                          II. Section 2-1401 Motion to Vacate

¶ 45     Next, we consider Erica's contention, raised in her motion to dismiss, that this court does not have jurisdiction to revisit the court's ruling denying Klay's section 2-1401 motion

seeking to vacate the 2008 paternity order establishing David's legal status as C.C.'s father. The trial court denied the relief requested in Klay's section 2-1401 motion on February 14, 2011.[1]

¶ 46     More than a year later, Klay filed his notice of appeal, on April 27, 2012, challenging that ruling and others. Consequently, Erica contends this court is without jurisdiction to review the court's ruling on Klay's section 2-1401 motion since the notice of appeal was not filed within 30 days of that decision.

¶ 47     Section 2-1401 of the Code provides a specific statutory procedure to attack final judgments. 735 ILCS 5/2-1401 (West 2008). Orders "granting or denying relief sought in a section 2-1401 petition are final and, thus, immediately appealable." *Village of Glenview v. Buschelman*, 296 Ill. App. 3d 35, 39 (1998); Ill. S. Ct. R. 304(b)(3) (eff. Feb. 26, 2010). The case law provides that a section 2-1401 pleading constitutes a separate action from the original pleading, in this case, the paternity action against *David*, and is, therefore, appealable on grounds independent from those used as a basis for appeal from the original judgment. *Glenview*, 296 Ill. App. 3d at 39.

¶ 48     Klay contends he could not appeal the February 14, 2011, ruling on his section 2-1401 motion until after the court resolved Erica's pending petition for attorney fees. We disagree. Klay was statutorily required to file a notice of appeal with respect to the denial of his section 2-1401 motion within 30 days of February 14, 2011. In this case, he did not do so. More than three months after the time expired for either party to file a notice of appeal from the denial of Klay's section 2-1401 motion and the order finding Klay to be the biological father of C.C., Erica filed her first request for Klay to pay a portion of her attorney fees. Thus, Erica's motion for attorney fees, dated June 29, 2011, was not pending at the time Klay neglected to properly perfect his appeal concerning the denial of his section 2-1401 motion, decided by the court on February 14, 2011.

¶ 49     Accordingly, we conclude Klay's April 27, 2012, notice of appeal challenging the February 14, 2011, ruling was not timely. The fortuitous circumstance that Erica subsequently requested contribution from Klay for her attorney fees did not resurrect the jurisdiction of this court to review the denial of Klay's request to vacate David's 2008 paternity order.

¶ 50                    III. Downward Deviation for Klay's Child Support

¶ 51     Next, we consider Erica's contention, as alleged in her motion to dismiss, that we do not have jurisdiction to review whether the trial court properly refused to calculate Klay's child support based on less than 20% of his income. Klay contends his notice of appeal was timely because the trial court did not render a final judgment until it resolved Erica's request for contribution for her attorney fees. We review a jurisdictional issue *de novo*. *In re Marriage*

---

[1]Erica's postjudgment petition for attorney fees was not filed until nearly four months later, after the time expired for either party to appeal the court's ruling on Klay's section 2-1401 motion.

*of Gutman*, 232 Ill. 2d 145, 150 (2008).

¶ 52        As previously stated, on June 29, 2011, nearly four months after the court denied Klay's section 2-1401 motion, Erica filed a motion requesting Klay to contribute to the payment of her attorney fees. At the time Erica filed this motion for contribution to attorney fees, the only two remaining unresolved issues with respect to *Klay's* petition to intervene involved the amount of Klay's permanent child support and whether Klay's visitation should be expanded to allow overnight visits. These issues were scheduled to be decided by the court on July 13, 2011.

¶ 53        A few days after Erica filed her motion regarding fees, Klay filed his motion, on July 5, 2011, requesting the court to deviate from the 20% statutory guidelines when setting his permanent order of support. Presumably, this request was intended to modify the relief he originally requested in his petition to establish the existence of a father-child relationship wherein he requested the court to enter an order requiring him to pay a full 20% of his net income in child support. Klay's subsequent motion requested the court to deviate downward from the 20% statutory guideline, by reducing it in half to just 10%, since C.C. had another legal father with a similar obligation to make contributions to Erica for C.C.'s financial support.

¶ 54        The case law provides that an "order is final [when] matters left for future determination are merely incidental to the ultimate rights that have been adjudicated by the order." (Internal quotation marks omitted.) *Galvez v. Rentas*, 403 Ill. App. 3d 491, 496 (2010) (quoting *In re T.M.*, 302 Ill. App. 3d 33, 37 (1998)). A careful review of the record shows that after denying Klay's request to pay 10% of his net income in child support on August 5, 2011, the trial court reserved ruling on the overnight visitation issue until a hearing could take place on September 19, 2011. Thus, the dissent is correct that the August 5, 2011, order was not a final appealable order.

¶ 55        Once the parties entered an agreed order of visitation on September 19, 2011, all pending matters on *Klay's* petition to intervene were resolved, thereby resulting in a "final judgment."[2] Consequently, based on *Galvez*, and precedent from this court discussed below, Klay should have filed his notice of appeal by October 18, 2011, to properly perfect the issue on appeal concerning the amount of permanent support he was ordered to pay on September 19, 2011.

¶ 56        In *A'Hearn (In re Marriage of A'Hearn*, 408 Ill. App. 3d 1091 (2011)), this court agreed with the holding of *In re Marriage of Carr*, 323 Ill. App. 3d 481 (2001), which continues to be instructive. *A'Hearn*, 408 Ill. App. 3d at 1097. In *Carr*, the husband filed a motion to reduce child support and, while this motion was pending, the wife filed a petition for attorney fees. *Carr*, 323 Ill. App. 3d at 485. After the trial court ruled on the husband's child support

_____

[2]On that same date, *Erica* filed another new motion *instanter* asking Klay to contribute to C.C.'s uncovered medical expenses. We conclude that, since the motion raised a new matter not previously pending before the court, that motion was more in the nature of a motion to modify the final judgment under section 16 of the Parentage Act (750 ILCS 45/16 (West 2010)), and did not extend the entry of final judgment on all pending matters in this case.

-10-

motion, the wife also filed a petition for rule to show cause against the husband for failing to pay college expenses. *Id.*

¶ 57    In *Carr*, the appellate court concluded the trial court's order granting the husband's motion to reduce child support was final and appealable within 30 days of that ruling, despite the fact the wife's petition for attorney fees and findings of contempt were pending in the trial court at the same time. *Carr*, 323 Ill. App. 3d at 485. In so reasoning, the court noted that the wife's petition for attorney fees had nothing to do with the *merits* of the original dissolution petition, and the husband's motion to reduce the amount of child support was unrelated to either the wife's petition for fees or the rule to show cause. *Id.*; see also *A'Hearn*, 408 Ill. App. 3d at 1097.

¶ 58    We recognize, as the dissent contends, these cases involve dissolution of marriage actions. However, the Parentage Act requires trial courts to refer to the standards in the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.* (West 2010)). Therefore, both decisions remain instructive to resolving similar child support issues in the case at bar. 750 ILCS 45/14 (West 2010).

¶ 59    In this case, the timing of each motion is a bit different from *Carr*, but the result remains the same. Erica's June 29, 2011, request for attorney fees had nothing to do with the merits of Klay's petition to intervene and motion to vacate. Further, Klay did not request downward deviation to make it possible for him to pay a share of Erica's attorney fees. Instead, his request was motivated by a desire to have the court recognize David's ability to contribution to C.C.'s financial support.

¶ 60    Therefore, based on this record, we conclude the issue of the amount of Klay's permanent child support was unrelated to whether Klay had the ability to pay a portion of Erica's attorney fees. Accordingly, we conclude this court does not have jurisdiction to review the court's denial of a request for downward deviation since Klay did not file his notice of appeal within 30 days of September 19, 2011 when the last issue, overnight visitation, was finally resolved by the court.

¶ 61                              IV. David's Parental Status

¶ 62    We respectfully disagree with the dissent's decision to offer an advisory opinion regarding the diminished status of David's parental rights for several reasons. First, in this appeal, Klay argues his child support obligation should have been cut in half because the trial court *maintained* David's legal status as C.C.'s father. Consequently, Klay does not assert that the trial court's combined, and arguably inconsistent, rulings on his petition to intervene, petition to establish his parental rights, and his separate section 2-1401 motion to vacate somehow operated to indirectly extinguish David's parental rights.

¶ 63    Second, this court has held that, absent a timely challenge, a VAP father's parental rights, such as David's parental rights, do not become void, as the dissent suggests, simply because the child is genetically linked to another man. See *In re Parentage of G.E.M.*, 382 Ill. App. 3d 1102, 1113 (2008); see also *Department of Public Aid v. Smith*, 212 Ill. 2d 389, 406 (2004) ("[I]t would be unreasonable to allow a man *** to undo his voluntary acknowledgment years later on the basis of DNA *** results, when his paternity was based

-11-

not on a mere marital presumption that he was the child's father but on [the] conscious decision to accept the legal responsibility of being the child's father."). Third, the Parentage Act clearly provides that, once a VAP father is adjudicated by a court to be a legal parent of a child, there is no longer a justiciable issue and the adjudicated father is the only man with a statutory right to file a petition to determine the nonexistence of the parent-child relationship. 750 ILCS 45/7(b-5) (West 2010).

¶ 64　　In addition, an adjudicated parent, like David, has a fundamental liberty interest in maintaining custody of his or her child. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). For example, in adoptions and paternity actions, a court order creates constitutionally protected parental rights without requiring any showing of shared DNA between parent and child. See *In re M.M.*, 156 Ill. 2d 53 (1993); *G.E.M.*, 382 Ill. App. 3d 1102; *Smith*, 212 Ill. 2d 389. The dissent's analysis does not address these constitutional considerations. Finally, the dissent attaches no significance to the trial court's finding that David's paternity order, entered in 2008, was not based on fraud and should not be vacated at Klay's request.

¶ 65　　However, we share the dissent's concerns that a trial court may not be able to simultaneously recognize two different men as the legal fathers of a child *born out of wedlock*, in the same parentage action.[3] The various issues tackled in this trial court, and perhaps others in the future, will continue to arise until the legislature modifies existing statutory presumptions of paternity. 750 ILCS 45/5 (West 2010). Perhaps, the lawmakers could require a VAP father to show proof of a genetic connection to the child before an unchallenged VAP creates a conclusive and nonrebuttable statutory presumption for a court to apply in a parentage action.

¶ 66　　Like the dissent, absent legislative action, we look forward to receiving our supreme court's guidance with respect to whether one child, born to an unwed mother, may simultaneously have two *additional* parents who share equal court-ordered parental rights and obligations with the biological mother based on the existing statutes. In fact, there are many other compelling issues that come to mind, which the parties have not asked us to consider, and our supreme court has not yet had an opportunity to address.

¶ 67　　For example, we question whether the current statutory scheme allows the trial court to compel a biological father, such as Klay, to pay *any* amount of court-ordered support when the child has a legal, conclusively presumed and fully adjudicated, VAP father. Klay has not asked us to consider this issue because he is willing to pay child support in a reduced amount.

¶ 68　　Similarly, we have concerns regarding whether the trial court correctly found that Klay had standing to intervene in this paternity action initiated by Erica. Yet, David and Erica have not filed a cross-appeal asking us to review this issue. Nor have they alleged the court's orders allowing Klay parental privileges and obligations are void. Moreover, David and Erica

---

[3]We distinguish the decision of our supreme court issued in *J.S.A. v. M.H.*, 224 Ill. 2d 182 (2007), since the child in that case was born to a birth mother who was legally married to someone other than the biological father of her child at the time of both conception and birth and involved different presumptions.

have not contested whether the trial court conducted an adequate best interests hearing, in this case, before usurping David and Erica's decision prohibiting Klay from having temporary or regular visitation with their daughter. See *J.S.A. v. M.H.*, 224 Ill. 2d 182, 211-12 (2007).

¶ 69     Rather than addressing the merits of any one of these intriguing issues, we follow the same approach exercised by our supreme court in *In re Parentage of J.W.*, 2013 IL 114817. In that case, our supreme court considered similar circumstances but did not take it upon itself, in the absence of a request by one of the parties, to declare one of the paternity orders void when two separate orders named two different fathers for the same child. Regarding two orders naming both a VAP father and a DNA father, the supreme court stated: "[F]or purposes of this appeal, we make no determination with regard to either party's standing, or as to [VAP father's] continued legal status as a parent." *J.W.*, 2013 IL 114817, ¶ 36 n.3. Therefore, the same degree of judicial restraint causes us to abstain from making any determination with respect to either David's or Klay's legal status as C.C.'s parent in the case at bar.

¶ 70     In summary, this court unanimously concludes we are without jurisdiction to directly review the merits of the court's ruling on Klay's section 2-1401 motion and unanimously agrees to set aside the order requiring Klay to pay a percentage of Erica's attorney fees, on grounds related to Klay's income alone. In addition, the majority concludes we do not have jurisdiction to review the method the trial court used to calculate the amount of Klay's child support. The dissent concludes this court should have jurisdiction to address the issue of downward deviation in Klay's child support and further addresses the status of David's parental rights based on this record.

¶ 71                                          CONCLUSION

¶ 72     For the foregoing reasons, the judgment of the circuit court of Fulton County with respect to attorney fees is reversed.

¶ 73     Reversed.

¶ 74     JUSTICE SCHMIDT, dissenting in part and concurring in part.

¶ 75     I dissent from that portion of the majority's opinion, beginning at paragraph 51, in which the majority concludes that we do not have jurisdiction to address Klay's request for a downward deviation from the statutory guidelines for child support. Ironically, it is only in paragraph 51 that the majority mentions the supreme court's decision in *Gutman*, and then only for the boilerplate proposition for the *de novo* standard of review of the legal issue of jurisdiction.

¶ 76     The majority determines that, notwithstanding a pending petition for attorney fees (filed on June 29, 2011), the trial court's August 5, 2011, ruling denying Klay's request to reduce child support was rendered final on September 19, 2011; therefore, Klay's failure to file a notice of appeal within 30 days of September 19, 2011, deprived this court of jurisdiction to

address the issue.

¶ 77    The majority relies upon *A'Hearn* to support its jurisdiction holding. Even assuming for the sake of argument that *A'Hearn* was correctly decided (it was not), *A'Hearn* dealt with postdissolution proceedings. This is not a postdissolution proceeding. No one here got divorced.

¶ 78    So, what we have here is a judicial expansion of an incorrect rule, set down in a wrongly decided case, ignoring supreme court rules and decades of law interpreting them.

¶ 79    Furthermore, there are numerous methods and rules which allow one to take an interlocutory appeal from all sorts of otherwise interlocutory orders. It would serve no purpose to list them all here. Suffice it to say, in light of the pending petition for attorney fees, the motion setting child support and denying Klay's request for a downward reduction from the statutory factors was not a final order. Had he filed a notice of appeal within 30 days and absent a Rule 304(a) finding (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)), we would have lacked jurisdiction to entertain that appeal. A reading of *In re Marriage of Gutman*, 232 Ill. 2d 145 (2008), makes that clear.

¶ 80    What is also troubling is that appellate courts, in applying "Kentucky windage" to established law and relatively clear principles of civil procedure, use it to deny appellate review of significant, if not life-changing, issues. The majority's analysis on jurisdiction above is, in essence: the request for attorney fees was unrelated to the child support issues. Therefore, unrelated issues should be treated as separate actions for purposes of the appealability of orders. If the majority here is correct, then Rule 304(a) has no purpose. Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010).

¶ 81    Out in the real world, far, far away from the rarified air of the appellate court, real lawyers are struggling to figure out how to best protect the rights of their respective clients. With all due respect, appellate decisions such as this make that job difficult, if not impossible. Additionally, it will make the extremely expensive proposition of litigation even more expensive. Now, when there is a ruling on any portion of a multiple claim case in the trial court, the lawyers will have to figure out whether an appellate court will decide if the issue ruled upon was sufficiently similar to the remaining issues so as not to require an interlocutory appeal, or whether two of three judges might find the issue sufficiently dissimilar from the other issues, requiring a notice of appeal to be filed within 30 days. One can expect reasonable lawyers to avoid malpractice exposure by filing notices of appeal on every order in the trial court for fear that failure to do so could find the issue unreviewable at a later time due to lack of jurisdiction.

¶ 82    A reading of the *A'Hearn* decision should lead to the inescapable conclusion that it was wrongly decided. It also clearly illustrates the mindset of the *A'Hearn* court. For example: "We note briefly that, although there are interlocutory appeals that provide for appellate review in postdissolution proceedings, *these mechanisms would not have given us jurisdiction in this case*." (Emphasis added.) *In re Marriage of A'Hearn*, 408 Ill. App. 3d 1091, 1098 (2011). The *A'Hearn* court recognized that Rule 304(b)(6) provided for immediate appealability of orders modifying custody. However, *A'Hearn* involved a denial of a request for modification of custody. *Id.* The court noted that Rule 306(a)(5) (Ill. S. Ct.

R. 306(a)(5) (eff. Feb. 16, 2011)) allowed a party to request an interlocutory appeal of orders affecting the care and custody of unemancipated minors. However, the *A'Hearn* appellant failed to seek leave within the required time. *A'Hearn*, 408 Ill. App. 3d at 1098.

¶ 83   In the *A'Hearn* court's "brief" discussion of the bases for interlocutory appeal, it fails to mention Rule 304(a).

¶ 84   I submit that long-standing rules on appeals from final orders and interlocutory appeals have, for the most part, been well understood by both the trial bar and the bench. In essence, *A'Hearn* acknowledges all of the supreme court rules that provide for appeals in domestic cases and decides: (a) appellant never requested a Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)) finding in the trial court; (b) the appellant did not seek leave to appeal under Rule 306(a)(5) (Ill. S. Ct. R. 306(a)(5) (eff. Feb. 16, 2011)); and (c) the order was not appealable under Rule 304(b)(6) (Ill. S. Ct. R. 304(b)(6) (eff. Feb. 26, 2010)). *A'Hearn*, 408 Ill. App. 3d at 1098. The *A'Hearn* court acknowledged that supreme court rules would not give the appellate court jurisdiction; it fashioned a new rule that would. That was bad enough. What the majority does here is much worse.

¶ 85   In *A'Hearn*, the court addressed issues on appeal prematurely since there was no basis for appellate jurisdiction. Nobody had their rights denied. Some time was wasted and some needless expense incurred. However, in this case, the majority denies a litigant the right of appellate review.

¶ 86   Our job as appellate judges is to help clarify the law. Sometimes our job is to decide issues of first impression. Our job is not to obfuscate the law and write new rules in the face of long-standing supreme court rules on the issue. No attorney, who has read and understood Rules 303 (Ill. S. Ct. R. 303 (eff. May 30, 2008)) and 304 (Ill. S. Ct. R. 304 (eff. Feb. 26, 2010)), would have reasonably thought that he had to file a notice of appeal of the August 5, 2011, order while there remained pending an unresolved, previously filed petition for attorney fees. I respectfully submit that the majority further obfuscates the issue in paragraph 59, which states:

> "In this case, the timing of each motion is a bit different from *Carr*, but the result remains the same. Erica's June 29, 2011, request for attorney fees had nothing to do with the merits of Klay's petition to intervene and motion to vacate. Further, Klay did not request downward deviation to make it possible for him to pay a share of Erica's attorney fees." *Supra* ¶ 59.

I can find no rational relationship between that statement and the issues before us. I will concede that no reasonable person could conclude that Klay requested the downward deviation to make it possible for him to pay a share of Erica's attorney fees. We are talking about whether we have jurisdiction to address issues raised in an order dated August 5, 2011. There were multiple issues pending in the trial court below, including child support, parentage, custody, and attorney fees. Of course, it is not unusual at all to have multiple issues, related and otherwise, pending in a single action in the trial court. *Ergo*, Supreme Court Rule 304. The only relevant issue regarding the timing of Klay's notice of appeal was that he filed it within 30 days of the resolution of the last claim in this case, the claim for attorney fees.

-15-

¶ 87    While the August 5, 2011, order denying Klay's request for a downward departure of child support payments settled that controversy, given the pending petition for attorney fees, it did not terminate the litigation between the parties or resolve all claims. As such, it was not an appealable order absent Rule 304(a) language. See *In re Marriage of Gutman*, 232 Ill. 2d at 151-52; Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010). We have jurisdiction to address Klay's child support arguments.

¶ 88                           II. Klay's Motion for Downward Departure
                                      From Statutory Guidelines

¶ 89    Klay argues the trial court erred in denying his motion for a downward departure from statutory guidelines based on the minor child having three legal parents. For the reasons stated below, I would find that the minor child cannot have three legal parents. Thus, the trial court did not err in refusing to grant a downward departure on that basis. I would affirm the trial court's order setting Klay's child support obligations and vacate any orders requiring David to pay child support.

¶ 90    The majority, perhaps not unreasonably, suggests that I am raising issues, even deciding issues, not raised by the parties. I disagree. Klay has raised the issue of whether his child support payments are to be reduced in light of the existence of another legal father, David. He has raised some legal arguments that I find unavailing. However, while a party can waive an issue, that party cannot require that an issue raised be decided under the wrong law. That is, one can waive an issue; one cannot waive the law.

¶ 91    On a personal level, I like the majority's result. I feel that I am as qualified as anyone to observe that biology has nothing to do with a parent's love for a child. However, the uncertainty of a parent's rights, whether those parental rights arose by virtue of a voluntary acknowledgment, adoption or otherwise, leads to unnecessary mental anguish on the part of those parents, as well as the children. I personally detest the result, which I believe the statutes and supreme court cases interpreting them mandate. As discussed below, courts have seemed to sidestep the issues discussed below and I cannot understand why. A definitive ruling by the supreme court could lead to ensuring that the law protects the rights of someone who has raised a child as if the child were his or her own from birth. I believe that the concept of three legal parents is untenable and would create a myriad of problems not only for the parents, but for the child as the child grows up and attends school. I believe the job of the courts is to help people; these parents and children can best be helped by a resolution of these issues sooner rather than later.

¶ 92    The record before us contains two orders identifying three different people as the legal parents of C.C. The first order entered November 6, 2008, identifies David as the legal father and Erica as the legal mother. The second order, entered February 14, 2011, identifies Klay as C.C.'s biological father and sets a visitation between Klay and C.C. This order established a parent-child relationship, which also made Klay a legal parent of C.C.

¶ 93    Through termination of a biological parent's parental rights and adoption by a nonbiological parent or parents, a child can have two women as mothers or two men as fathers. See *In re Petition of K.M.*, 274 Ill. App. 3d 189 (1995); *Connor v. Velinda C.*, 356

-16-

Ill. App. 3d 315 (2005). However, whether a child can have a legal mother and two legal fathers appears to be a case of first impression in Illinois.[4] I acknowledge that even the United States Supreme Court has been called upon and struggled with scenarios involving numerous parents of the same sex who seek legal rights and control over a child. "California law, like nature itself, makes no provision for dual fatherhood." *Michael H. v. Gerald D.*, 491 U.S. 110, 118 (1989).

¶ 94    For the reasons set forth below, I believe that Illinois law does not authorize a child to have two legal fathers and one legal mother. Therefore, one of the orders must be void. We have a duty to identify void orders in the record before us. *Gilchrist v. Human Rights Comm'n*, 312 Ill. App. 3d 597, 601 (2000) ("Because this court has a duty to vacate and expunge void orders from court records, we may *sua sponte* declare an order void.").

¶ 95    To explain my conclusion, I first briefly summarize the provisions of the Illinois Parentage Act of 1984 (Parentage Act). The Parentage Act provides that a father-child relationship may be established in a number of ways: by presumption (750 ILCS 45/5(a) (West 2010)), by consent (750 ILCS 45/6 (West 2010)), or by judicial determination (750 ILCS 45/7 (West 2010)). Section 7(a) of the Parentage Act provides:

> "An action to determine the existence of the father and child relationship, whether or not such a relationship is already presumed under Section 5 of this Act [(750 ILCS 45/5)], may be brought by *** a man presumed or alleging himself to be the father of the child or expected child." 750 ILCS 45/7(a) (West 2010).

¶ 96    The Parentage Act allows a putative father to establish his parentage of a child up until the child attains the age of 20. 750 ILCS 45/8(a)(1) (West 2010). The Parentage Act also provides an action to declare the nonexistence of a parent-and-child relationship within two years after the petitioner learns of "relevant facts." 750 ILCS 45/7(b) (West 2010).

¶ 97    Section 5 establishes paternity by presumption in four circumstances: (1) when a man and the child's mother are or have been married and the child is born or conceived during the marriage; (2) when the man and the child's natural mother have married each other after the child's birth and the man is named, with his written consent, as the child's father on the child's birth certificate; (3) when the man and the child's natural mother have signed a voluntary acknowledgment of paternity; or (4) when the man and the natural mother have signed an acknowledgment of parentage or, if the "natural father is someone other than one presumed to be the father under this Section, an acknowledgment of parentage and denial of paternity in accordance with Section 12 of the Vital Records Act." 750 ILCS 45/5 (West 2010).

¶ 98    The Parentage Act gives a putative father the right to request DNA testing to determine if he is the biological father of the child and mandates the circuit court order the parties to submit to testing upon the man's request. 750 ILCS 45/11(a) (West 2010) ("As soon as practicable, the court *** may, and upon request of a party shall, order or direct the mother,

---

[4]The factual scenario here has existed in other cases, but no Illinois court has found itself in a position where it felt obligated to address the issue. See, *e.g.*, *In re Parentage of J.W.*, 2013 IL 114817, ¶ 36 n.3.

child and alleged father to submit to deoxyribonucleic acid (DNA) tests to determine inherited characteristics."). The Parentage Act allows for the presumptions of section 5 listed above to be rebutted if the results of the genetic testing show that the legally presumed father is not the child's biological father. 750 ILCS 45/11(f)(4) (West 2010).

¶ 99      Proof of paternity will trigger financial obligations owed by the legal father. However, merely establishing paternity does not automatically result in the acquisition of parental rights. As our supreme court recently noted, "a judgment of paternity does not automatically entitle a biological father to visitation. Rather, the 'privilege' of visitation is subordinate to the best interests of the child." *In re Parentage of J.W.*, 2013 IL 114817, ¶ 39 (citing *J.S.A. v. M.H.*, 224 Ill. 2d 182, 211 (2007)); see also *In re Parentage of John M.*, 212 Ill. 2d 253, 265 (2004) ("Thus, even though paternity may be established upon the filing of a petition pursuant to section 7(a), any parental rights of the biological father, such as the right to have custody of, or visitation with, the child, shall not be granted unless it is in the child's best interest."). Section 14(a)(1) of the Parentage Act provides that any decision regarding custody and visitation of the child "shall determine in accordance with the relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act and any other applicable law of Illinois, to guide the court in a finding in the best interests of the child." 750 ILCS 45/14(a)(1) (West 2010).

¶ 100      To determine whether this statutory scheme allows C.C. to have a legal mother and two legal fathers, I turn to familiar rules of construction. The fundamental rule of statutory construction is to determine and carry out the legislature's intent. *In re G.M.*, 2012 IL App (2d) 110370. "The best indication of the legislature's intent is the language of the statute, given its plain and ordinary meaning." *Id.* ¶ 11. A thorough reading of the Parentage Act and the Illinois Marriage and Dissolution of Marriage Act (the Marriage Act) (750 ILCS 5/101 *et seq.* (West 2010)) supports the conclusion that the Illinois legislature only contemplated a child having one legal father and one legal mother, again, barring termination of parental rights and adoption.

¶ 101      Each mention of a child-father relationship is written in the singular. For example, the relevant portion of section 2 of the Parentage Act provides "the mother and child relationship and *the father* and child relationship." (Emphasis added.) 750 ILCS 45/2 (West 2010). Additionally, section 18 of the Parentage Act requires "*either or both* parents" to pay for costs associated with a guardian *ad litem*. (Emphasis added.) 750 ILCS 45/18 (West 2010). When discussing a man's paternity, the Parentage Act routinely uses the phrase "he and the child's natural mother." 750 ILCS 45/5(a)(1), (a)(2), (a)(3), (a)(4) (West 2010). Allowing a child to have a natural mother and two legal fathers is inconsistent with this statutory language.

¶ 102      In *In re Marriage of Adams*, 297 Ill. App. 3d 156, 157-58 (1998), the mother told her husband that she conceived two children by artificial insemination. The woman, however, had two extramarital affairs and the children were actually conceived during those affairs. *Id.* at 157. The husband filed for dissolution after learning about the affairs and asked for his support obligations to be terminated. *Id.* At the same time, the mother filed paternity actions against the biological fathers, Timothy Arnold, and Paul Robert Ziegler. *Id.* The latter settled with the mother. *Id.* The trial court terminated the husband's obligations, declared Timothy

Arnold the child's father, and ordered Arnold to pay support. *Id.* On appeal, the Fourth District stated, "[The mother] filed an action to prove the *existence* of a parent and child relationship. Implicit in every petition to prove the existence of that relationship under section 8(a)(1) is proof of the *non-existence* of the relationship to everyone else." (Emphases in original.) *Id.* at 160. This principle was echoed in *In re G.M.*, 2012 IL App (2d) 110370, when the court commented, "Obviously, a declaration that one person is a child's father necessarily implies that all others are not the child's father." *Id.* ¶ 12. I agree.

¶ 103    I would hold that the order establishing the parent-child relationship between Klay and the minor child, as a matter of law, terminated David's presumptive fatherhood. While the trial court possessed the authority at the time to enter the November 6, 2008, order identifying David as C.C.'s legal father, its subsequent order establishing a parent-child relationship between Klay and C.C. effectively vacated the November 6 order. I acknowledge that David has not asked that his status as legal father be terminated. My proposed holding would not, *ipso facto*, foreclose David from involvement or taking an active role in the child's life. See, *e.g.*, *In re Marriage of Roberts*, 271 Ill. App. 3d 972 (1995); *Koelle v. Zwiren*, 284 Ill. App. 3d 778 (1996). In fact, at this stage, we cannot even rule out possible custody for David. These issues can be resolved at a best interest hearing.

¶ 104    Merely establishing a parent-child relationship does not equate to parental rights such as visitation or custody. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 39. After determination of a parent-child relationship but before determining custody and visitation, the parties should proceed to a best interest hearing. *Id.* I note that the trial court's order of February 14, 2011, purports to set a date for such a hearing. However, it sets the hearing for "February 4, 2011," which is obviously 10 days before the trial court entered the order.

¶ 105    A review of the record below suggests that no best interest hearing took place. The record indicates a hearing on the petition for fees took place on March 7, 2012. The trial court entered an agreed order regarding visitation on April 21, 2011, following court-ordered mediation and hearings that took place on May 18, 2011, and October 17, 2011, during which the parties discussed Klay's support commitments and attorney fees. I would remand this matter to the trial court with the direction to hold a best interest hearing.