NOTICE

Decision filed 09/08/20. The text of this decision may be changed or corrected prior to the filing of a Petiion for Rehearing or the disposition of the same.

2020 IL App (5th) 200084-U

NO. 5-20-0084

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| BRANDON ALEXANDER DEAVER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 18-F-57 |
| | ) | |
| MEADOW JORDAN, | ) | Honorable |
| | ) | Timothy R. Neubauer, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE OVERSTREET delivered the judgment of the court.
Justice Wharton concurred in the judgment.
Justice Barberis dissented.

**ORDER**

¶ 1    *Held*: The circuit court properly entered judgment denying mother's request to prohibit father's parenting responsibility or parenting time with child.

¶ 2    The respondent, Meadow Jordan, appeals the circuit court's August 1, 2019, order granting the petitioner, Brandon Deaver, parenting time with the parties' minor child, W.M.J. On appeal, Meadow argues that the court erroneously interpreted section 622 of the Illinois Parentage Act of 2015 (Parentage Act) (750 ILCS 46/622 (West 2018)) in determining that Meadow's adoptive mother, Tamara Jordan, had the legal right to consent, on Meadow's behalf, to Brandon's parenting time with W.M.J. For the following reasons, we affirm the circuit court's judgment.

1

¶ 3                                I. BACKGROUND

¶ 4     Meadow was born on March 6, 2001, and was 15 years old when W.M.J. was born on May 4, 2016.  On June 18, 2018, Brandon, W.M.J.'s biological father, filed a petition to establish paternity, child support, and allocation of parenting time and decision-making responsibilities. In his petition, Brandon sought an order recognizing his paternity of W.M.J., requiring Meadow to pay child support in an amount consistent with statutory guidelines, and awarding him sole decision-making responsibilities, primary residential custody, and reasonable parenting time.

¶ 5     On July 30, 2018, Meadow filed a motion for fact-finding hearing, asserting that Illinois law barred Brandon from seeking custody or visitation with W.M.J. because he fathered W.M.J. through an act of criminal sexual abuse. Meadow alleged that Brandon had not been charged criminally for his conduct and that she did not seek to have him charged criminally. Meadow alleged, however, that when W.M.J. was conceived, she was 14 years old, below the age of consent for sexual activity, and that Brandon was at least 17 years old. Meadow also alleged that continued contact with Brandon was causing her emotional distress and a feeling of victimization. Thereafter, on November 8, 2018, and February 8, 2019, Meadow filed amended motions for a fact-finding hearing, arguing that section 622(a)(2) of the Parentage Act (750 ILCS 46/622(a)(2) (West 2018)) prohibited Brandon's request for paternity, parenting time, and decision-making responsibilities for W.M.J. because he fathered W.M.J. though an act of criminal sexual abuse.

¶ 6     On October 12, 2018, November 28, 2018, and February 25, 2019, Brandon filed corresponding answers to Meadow's motions for a fact-finding hearing. In his answers,

Brandon admitted that Meadow was under the age of legal consent when W.M.J. was conceived and alleged that he was also a minor when W.M.J. was conceived. Brandon denied that he should be barred from parenting time with W.M.J., based solely on his act of fathering a child when he was a 17-year-old minor. Brandon further alleged that as a minor, Meadow had no power to consent to his parenting time with W.M.J. Brandon alleged that Meadow's mother, Tamara, was instead empowered to consent to Brandon's parenting time with W.M.J. and that Tamara had consented and continued to consent to Brandon's exercise of his parenting time with W.M.J. Brandon further asserted the affirmative defenses of consent and estoppel.

¶ 7     At a hearing held on October 18, 2018, Meadow, who was 17 years old at the time of the hearing, testified that she was 14 years old when W.M.J. was conceived. Meadow acknowledged that she had consented to a relationship between W.M.J. and Brandon for six months, when W.M.J. was approximately six months old until she was one year old. Meadow acknowledged that Brandon lived with her and Tamara during that six-month period. Meadow further acknowledged that she once took W.M.J. to meet Brandon after W.M.J. turned one year old. Meadow testified that Tamara thereafter "was going behind [her] back and taking [W.M.J.] to visits" with Brandon. When asked, "[D]o you consent to a relationship between [W.M.J.] and Brandon," she answered, "As of now? No."

¶ 8     At the hearing, Tamara testified that she married Meadow's father on January 17, 2004, that she adopted Meadow on January 18, 2011, and that Meadow's father died on August 13, 2015. Tamara testified that Meadow was living in her home when her husband died and that Meadow continued to live in her home until May 2018. Tamara

testified that Meadow and Brandon began dating early 2015, and that she learned Meadow was pregnant in the fall of 2015. Tamara testified that she and Meadow bonded after Meadow's pregnancy and that she attended Meadow's prenatal appointments and participated with Meadow in Best Beginnings, a parenting program for young mothers. Tamara testified that Brandon also participated in the Best Beginnings appointments with them.

¶ 9 Tamara testified that Meadow and Brandon dated prior to W.M.J.'s conception but were no longer dating when W.M.J. was born. Tamara testified, however, that when W.M.J. was three or four months old, Brandon began visiting W.M.J. at her and Meadow's home and visited W.M.J. almost every day for about a year. Tamara testified that Brandon visited at both her and Meadow's agreed invitation. Tamara testified that when W.M.J. was approximately 15 months old, Meadow and Brandon broke up again, and Meadow no longer wanted Brandon to visit W.M.J. Tamara testified that she cared for W.M.J. the majority of the time, when Meadow was attending school, working, or socializing with friends. Tamara testified that when caring for Meadow, she continued to allow Brandon to visit W.M.J., even though Meadow did not want him to visit, "[b]ecause [she] thought that he was the father and deserved that." Tamara testified that Meadow knew Brandon was visiting W.M.J. while Meadow was working or doing other things and that Meadow never threatened to take W.M.J. from Tamara if she continued to allow Brandon parenting time with W.M.J.

¶ 10 Tamara confirmed that Meadow was 17 years old on the date of the hearing and that Meadow had not been emancipated from her. Tamara acknowledged that she

4

consented to Brandon's exercise of parental responsibility and parenting time with W.M.J. Tamara testified that she believed Brandon should be allowed to exercise his parental responsibility and parenting time with W.M.J. because he was her father, they had a close relationship, and he properly cared for her. Tamara testified that Meadow never acted frightened of Brandon and that their split was simply a teenage breakup.

¶ 11    Following Tamara's testimony, the parties stipulated that Brandon and W.M.J. had an ongoing relationship for a period of time after W.M.J. was born and that for a period of time, Meadow consented to Brandon's parenting relationship with W.M.J.

¶ 12    Brandon testified that he was 21 years old at the time of the hearing. Brandon testified that he had previously dated Meadow, having met her at the skating rink, and had reestablished a relationship with Meadow when W.M.J. was about four months old. Brandon testified that he lived with Meadow, W.M.J., and Meadow's family for about one year. Brandon testified that he changed W.M.J.'s diapers, fed her, and woke in the night with her. Brandon testified that after living with Meadow for approximately one year, he and Meadow ceased dating, but he continued to visit W.M.J. through Tamara, with whom he had a good relationship. Brandon testified that after W.M.J.'s second birthday on May 4, 2018, he learned that Meadow was considering adoption for W.M.J. Brandon testified that he worked at a local tire factory and was prepared to financially provide for and parent W.M.J.

¶ 13    Throughout the proceedings, the circuit court entered orders allocating Brandon parenting time with W.M.J. On October 25, 2018, the circuit court entered an order awarding Brandon parenting time on specified days until December 14, 2018, at which

time the circuit court awarded Brandon parenting time on alternating weekends from Friday at 10 a.m. until Sunday at 2 p.m. The circuit court ordered that Brandon exercise his parenting time at Tamara's home. On December 20, 2018, the circuit court entered an agreed order, wherein the parties agreed that allowing Brandon parenting time with W.M.J. was in W.M.J.'s best interest and allotted specified holiday parenting time with W.M.J. to Brandon. On February 7, 2019, the circuit court entered an order, wherein it found that Brandon and Meadow shall alternate parenting time weeks, thus granting Brandon an equal amount of parenting time with W.M.J. as that granted to Meadow, and that the specified parenting time schedule would remain in effect until further court order. On June 26, 2019, the circuit court entered an agreed order, wherein the parties amended their previous agreement to allow each extended time with W.M.J. in order to vacation with her in the summer. On September 30, 2019, Meadow filed a petition to modify parenting time to accommodate W.M.J. attending preschool, and on October 10, 2019, the circuit court modified Brandon's parenting time with W.M.J. to accommodate her preschool schedule.

¶ 14    On August 1, 2019, the circuit court considered the evidence presented on October 18, 2018, and entered its order on Brandon's petition to establish paternity, child support, and an allocation of parenting time and decision-making responsibilities and on Meadow's petition for a fact-finding hearing. In its order, the circuit court concluded that Brandon was a person described in subsection (a) of section 622 of the Parentage Act (750 ILCS 46/622(a)) because although the evidence revealed that Brandon and Meadow's sexual relations were factually consensual, the conduct qualified as

6

misdemeanor sexual abuse (720 ILCS 5/11-1.50 (West 2018)) because of the parties' ages.

¶ 15 The circuit court noted that Tamara had testified to the significant amount of time that Brandon had spent with W.M.J. when Meadow lived with her and that the parties had stipulated that Brandon had an ongoing relationship with W.M.J. The circuit court found that Meadow had allowed Brandon to exercise parenting time with W.M.J., when W.M.J. was a couple of months old until W.M.J. turned two years old. The circuit court accepted Brandon's unrefuted testimony that he was an active participant in W.M.J.'s life until Meadow began dating someone else. The circuit court noted that even then, Brandon was allowed parenting time with W.M.J., when W.M.J. was in Tamara's care. The circuit court further noted that since turning 18, Meadow had consented to Brandon's ongoing relationship with W.M.J. pursuant to the parties' agreed order for parenting time. The circuit court thus concluded that Meadow had consented to an allocation of parenting time for Brandon to exercise with W.M.J. In holding that Meadow had consented to an allocating of parenting time for Brandon, the circuit court noted:

"Legislative history suggests that one purpose of the statute is to protect a woman from being forced to remain in communication with a person who committed an act of sexual misconduct against her. In this case, that goal is not a necessary one where [Meadow's] conduct all along has indicated that she has no issues with [Brandon] that the statute is designed to address."

7

¶ 16    In its order, the circuit court further concluded that Tamara had also consented, on Meadow's behalf, prior to Meadow's eighteenth birthday, to an allocation of Brandon's parenting time with W.M.J. The circuit court found that W.M.J., who was three years old, knew her father, enjoyed a close bond with him, and had spent half of her time in his care. The circuit court thus concluded that it was in W.M.J.'s best interest to continue the close bond she shared with Brandon and rejected Meadow's request to prohibit the allocation of parental responsibility and parenting time for Brandon.

¶ 17    On September 3, 2019, Meadow filed a motion to reconsider, arguing that the circuit court failed to make a finding regarding whether W.M.J. was fathered by nonconsensual sexual penetration "due to the respective ages of the mother and father at the time of conception." Meadow argued that it was of no concern how willing a particular minor might be about sexual activity, at the age of 14, she could not legally consent to sexual activity with Brandon, who was 17 years old when W.M.J. was conceived. Meadow argued that Brandon thus committed an act of nonconsensual sexual penetration pursuant to the Parentage Act. Meadow further argued that only she had the authority to consent to the allocation of parental responsibilities or parenting time for Brandon and that Brandon slept on his rights for failing to file a petition until W.M.J. was two years old.

¶ 18    On September 26, 2019, Brandon filed a response to Meadow's motion to reconsider, arguing that the circuit court did not fail to make a finding as to whether W.M.J. had been fathered by nonconsensual sexual penetration where the circuit court had specifically stated, " 'this court holds that subsection (a) has been established.' " In

8

addition, Brandon asserted that the circuit court did not err in finding that Tamara had the power to consent for Meadow in allowing Brandon parenting time with W.M.J. and that Meadow was estopped from asserting her defense under section 622 of the Parentage Act, where she had consented to Brandon's exercise of parenting time with W.M.J., which had led to a strong parent-child relationship. On February 10, 2020, the circuit court denied Meadow's motion to reconsider, and on March 5, 2020, Meadow filed a timely notice of appeal.

¶ 19                                   II. ANALYSIS

¶ 20     As a preliminary matter, Brandon filed in this court a motion to dismiss Meadow's appeal, or alternatively, to strike Meadow's brief or portions of Meadow's statement of facts contained in her brief. Brandon claims in his motion that Meadow's brief violates various supreme court rules, including Illinois Supreme Court Rules 321 (eff. Feb. 1, 1994); 341(h)(6) (eff. May 25, 2018); 341(h)(9) (eff. May 25, 2018); and 342 (eff. Oct. 1, 2019). Specifically, Brandon asserts that Meadow's appeal should be dismissed because she failed to provide this court with a complete record in violation of Supreme Court Rule 321. In support, Brandon claims Meadow's exhibits 1 and 2, which were admitted at the October 18, 2018, hearing, were not included in the record on appeal. Next, in the event the appeal is not dismissed, Brandon requests this court to strike Meadow's brief because it does not contain an appendix, as required in Supreme Court Rules 341(h)(9) and 342. Alternatively, Brandon requests this court to strike portions of Meadow's statement of facts because her brief contains an incomplete statement of facts, inaccurate

9

record citations, and improper argumentative facts in violation of Supreme Court Rule 341(h)(6).

¶ 21 This court acknowledges that "where the appellant's brief violates the requirements of our supreme court rules, the 'appellate court has discretion to strike [that] brief and dismiss the appeal' or disregard appellant's arguments." *Budzileni v. Department of Human Rights*, 392 Ill. App. 3d 422, 440 (2009) (quoting *Alderson v. Southern Co.*, 321 Ill. App. 3d 832, 845 (2001)). However, where supreme court rule violations are not so flagrant as to hinder our review, the striking of a brief in whole or in part may be unwarranted. *Id.* Although Meadow's brief as a whole, including the appendix and statements of facts, reveals a failure to fully comply with Supreme Court Rules 321, 341(h)(6), 341(h)(9), and 342, we conclude that the violations are not so flagrant as to hinder our review. Accordingly, we find that dismissing the appeal or striking the brief is an inappropriate sanction, and we elect to simply disregard the offending portions. We thus turn to the merits of Meadow's appeal.

¶ 22 On appeal, Meadow challenges the circuit court's order by arguing that the circuit court erred in finding that Tamara had legal authority to consent to parenting time on Meadow's behalf pursuant to section 622 of the Parentage Act. 750 ILCS 46/622 (West 2018).

¶ 23 "[I]ssues of statutory construction are questions of law subject to *de novo* review." *People v. Lloyd*, 2013 IL 113510, ¶ 25. "When construing a statute, this court's primary objective is to ascertain and give effect to the legislature's intent, keeping in mind that the best and most reliable indicator of that intent is the statutory language itself, given its

10

plain and ordinary meaning." *Id.* "In determining the plain meaning of the statute, we consider the subject the statute addresses and the legislative purpose in enacting it." *Id.* "[S]tatutes should be read as a whole and construed so that no part is rendered meaningless or superfluous." *Id.* "In doing so, we may consider the statute's context, reading the provision at issue in light of the entire section in which it appears, and the Act of which that section is a part." *Id.*

¶ 24　Section 622 of the Parentage Act is entitled "Allocation of parental responsibilities or parenting time prohibited to men who father through sexual assault or sexual abuse" and provides as follows:

"(a) This Section applies to a person who has been found to be the father of a child under this Act and who:

(1) has been convicted of or who has pled guilty or *nolo contendere* to a violation of Section 11-1.20 (criminal sexual assault), Section 11-1.30 (aggravated criminal sexual assault), Section 11-1.40 (predatory criminal sexual assault of a child), Section 11-1.50 (criminal sexual abuse), Section 11-1.60 (aggravated criminal sexual abuse), Section 11-11 (sexual relations within families), Section 12-13 (criminal sexual assault), Section 12-14 (aggravated criminal sexual assault), Section 12-14.1 (predatory criminal sexual assault of a child), Section 12-15 (criminal sexual abuse), or Section 12-16 (aggravated criminal sexual abuse) of the Criminal Code of 1961 or the Criminal Code of 2012, or a similar statute in another jurisdiction, for his conduct in fathering that child; or

11

(2) at a fact-finding hearing, is found by clear and convincing evidence to have committed an act of non-consensual sexual penetration for his conduct in fathering that child.

(b) A person described in subsection (a) shall not be entitled to an allocation of any parental responsibilities or parenting time with that child without the consent of the child's mother or guardian. If the person described in subsection (a) is also the guardian of the child, he does not have the authority to consent to parenting time or the allocation of parental responsibilities under this Section. If the mother of the child is a minor, and the person described in subsection (a) is also the father or guardian of the mother, then he does not have the authority to consent to the allocation of parental responsibilities or parenting time.

* * *

(f) A petition under this Section may be filed by the child's mother or guardian either as an affirmative petition in circuit court or as an affirmative defense in any proceeding filed by the person described in subsection (a) of this Section regarding the child." 750 ILCS 46/622 (West 2018).

¶ 25    "Parental responsibilities" is defined in section 600(d) of the Illinois Marriage and Dissolution of Marriage Act as "both parenting time and significant decision-making responsibilities with respect to a child." 750 ILCS 5/600(d) (West 2018). "Parenting time" is defined in section 600(e) of the Illinois Marriage and Dissolution of Marriage Act as "the time during which a parent is responsible for exercising caretaking functions

12

and non-significant decision-making responsibilities with respect to the child." *Id.* § 600(e).

¶ 26 In its order, the circuit court denied Meadow's request to prohibit an allocation of parental responsibilities or parenting time for Brandon on the basis of section 622 of the Parentage Act (750 ILCS 46/622 (West 2018)). The circuit court found that because of the parties' ages, Brandon committed nonconsensual sexual penetration and was thus "a person described in subsection (a) of" section 622. The circuit court determined, however, that both Meadow and Tamara had consented to the allocation of parental responsibilities and parenting time for Brandon, and therefore, Brandon was not prohibited from receiving an allocation of parental responsibilities and parenting time with W.M.J.

¶ 27 We note that this court may affirm a circuit court's decision on any basis that appears in the record before us. *Father & Sons Home Improvement II, Inc. v. Stuart*, 2016 IL App (1st) 143666, ¶ 27. In this case, we agree with the circuit court's conclusion that Meadow consented to the allocation of parental responsibilities and parenting time for Brandon. The plain language of subsection (b) of section 622 of the Parentage Act provides that "[a] person described in subsection (a) shall not be entitled to an allocation of any parental responsibilities or parenting time with that child without the consent of the child's mother or guardian." 750 ILCS 46/622(b) (West 2018). In this phrase, the legislature did not delineate between minor parents and adult parents; thus, the plain language reveals that a minor mother may consent to an allocation of parental responsibilities or parenting time for the father. Such an interpretation is consistent with

13

other laws finding a minor parent's consent appropriate in other circumstances. See 410 ILCS 210/1 (West 2018) (a parent who is a minor may consent to performance of health care service by a physician and is deemed to have same legal capacity to act as a person of legal age); 750 ILCS 50/11(a) (West 2018) (consent to adoption or surrender of a child by a parent who is a minor shall not be voidable because of such minority).

¶ 28   In this case, the evidence revealed that when W.M.J. was four months old, Meadow consented to an apportionment of parental responsibilities and parenting time for Brandon and that Brandon exercised his parental responsibilities and parenting time with W.M.J. thereafter. Thus, the evidence supported the circuit court's conclusion that Meadow consented to an allocation of parental responsibilities and parenting time for Brandon (750 ILCS 46/622(a), (b) (West 2018)), and Meadow does not argue on appeal that she did not consent to an allocation of parental responsibilities and parenting time for Brandon. *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 253 (2010); Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Points not argued [in the appellant's brief] are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 29   The plain language of section 622(b) requires a mother's consent to an allocation, defined by Merriam-Webster's Dictionary as an 'apportion[ment] for a specific purpose or to particular persons or things" (Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/allocate (last visited Aug. 13, 2020)), of any parental responsibilities or parenting time by the father with the child. The plain language of section 622(b) does not require a mother's continued or ongoing consent for each exercise of parental responsibility or each exercise of parenting time by the father.

14

The plain language of section 622(b) also does not require a mother's consent for an "allocation judgment" by the court. See 750 ILCS 5/600(b) (West 2018) (" '[a]llocation judgment' means a judgment allocating parental responsibilities"). Here, the evidence revealed Meadow's consent to an allocation of parental responsibilities and parenting time by Brandon, and, thus, her contention that she no longer consents is inconsequential. This conclusion is bolstered by the Parentage Act's primary purpose, which is to guide the court in determining the best interest of the child. *J.S.A. v. M.H.*, 224 Ill. 2d 182, 200 (2007). In this case, the evidence supported the conclusion that with Meadow's consent, Brandon had established a consistent presence, care, and close bond with W.M.J., and that allocating Brandon parental responsibilities and parenting time with W.M.J. served her best interest.

¶ 30    Because the circuit court's judgment may be affirmed on this basis, we need not address Meadow's argument regarding Tamara's authority to consent to the allocation of parental responsibilities or parenting time on her behalf. Accordingly, we affirm the judgment of the circuit court, denying Meadow's request to prohibit the allocation of parental responsibilities and parenting time by Brandon pursuant to section 622 of the Parentage Act (750 ILCS 46/622 (West 2018)).

¶ 31                    III. CONCLUSION

¶ 32    For the reasons stated, we affirm the judgment of the circuit court of Jefferson County.


¶ 33    Affirmed.

15

¶ 34   JUSTICE BARBERIS, dissenting:

¶ 35   I respectfully dissent and would reverse the judgment of the circuit court.

¶ 36   I find it appropriate to note the difficult nature of this case. By all accounts, it appears Meadow and Brandon had a relationship at some point during high school when Meadow was 14 and Brandon was 17. Following the birth of W.M.J., however, their relationship became contentious, and Meadow filed a motion for fact-finding hearing to bar Brandon from legally establishing parental responsibilities or parenting time with W.M.J. As the majority correctly states, the record demonstrates that Brandon spent time with W.M.J. and had established a relationship with the child.

¶ 37   At the fact-finding hearing on Meadow's motion, the circuit court found that Brandon's actions in fathering the minor child, although factually consensual, due to the age of the parties, nonetheless constituted criminal sexual abuse. Thus, section 622(a) had been established. On appeal, the parties do not contest the court's factual finding in this regard. Rather, the parties dispute whether Tamara, Meadow's mother, could legally consent on behalf of Meadow to allow Brandon to exercise parenting time and parental responsibilities. The parties also dispute whether the court's determination that Meadow was estopped from asserting the affirmative defense under section 622(b), based on her previous consent to Brandon exercising parenting time with the minor child for a number of years, was against the manifest weight of the evidence. After a thorough review of the relevant statute and the record on appeal, I believe the only issue before this court is the circuit court's erroneous interpretation of section 622(b).

16

¶ 38   Although the majority is correct in stating that it may affirm on any grounds, I believe it fails to address the relevant issue before this court. Although I fully recognize the difficult nature of this case, the majority's desire in this instance to provide a father visitation with his minor child ignores the plain language of section 622(b), which makes clear that, after an individual is found to have committed an act of "non-consensual sexual penetration for his conduct in fathering that child" under section 622(a)(2), the circuit court has no authority to enter an order of parental responsibilities or parenting time *unless* the minor mother is in agreement. As such, the purpose of the fact-finding hearing was not intended for the court to make a factual determination as to whether Meadow had ever consented to Brandon exercising parenting time with the minor child. Rather, the fact-finding hearing was held to determine whether Brandan's act of fathering the minor child constituted "non-consensual sexual penetration" under section 622(a)(2). Thus, after the court determined that section 622(a) had been established, the court then had no authority to enter an order allocating parental responsibilities and parenting time, unless Meadow, and Meadow alone, was in agreement.

¶ 39   Accordingly, I believe the circuit court erred when it, first, erroneously found that Tamara could legally consent on behalf of Meadow, and, second, determined that Meadow was estopped from raising the affirmative defense set forth in section 622(b) because she had consented in the past to Brandon exercising parenting time with the minor child. The record clearly demonstrates that Meadow continued to pursue a fact-finding hearing throughout the course of this litigation, which evidences her lack of consent to an allocation of parental responsibilities and parenting time to Brandon.

17

Because Brandon was found to be a person described in section 622(a), and the record clearly shows that Meadow did not consent, it is my view that the court erred by entering an order allocating parental responsibilities and parenting time to Brandon.

¶ 40    Therefore, I would reverse the judgment of the circuit court.